5 A.3d 1174 (2010)
195 Md. App. 124
MARYLAND TRANSPORTATION AUTHORITY POLICE LODGE # 34 OF the FRATERNAL ORDER OF POLICE, INC., et al.
v.
MARYLAND TRANSPORTATION AUTHORITY, et al.
No. 1885, Sept. Term, 2008.
Court of Special Appeals of Maryland.
September 30, 2010.
*1178 Michael Marshall (Schlachman, Belsky & Weiner, PA, on the brief) Baltimore, MD, for appellant.
Kathleen E. Wherthey (Joshua N. Auerbach, Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.
Panel: HOLLANDER, MATRICCIANI, RAYMOND G. THIEME, JR., (Retired, specially assigned), JJ.
HOLLANDER, J.
This appeal involves a dispute between the Maryland Transportation Authority Police Lodge # 34 of the Fraternal Order of Police, Inc. ("FOP" or the "Lodge"), appellant/cross-appellee, and the Maryland Transportation Authority ("MdTA" or the "Authority"), appellee/cross-appellant. At issue is a "Memorandum" signed in February 2006 by Trent M. Kittleman, then the Executive Secretary of the MdTA, and Cpl. John Zagraiek, the President of the Lodge (the "Agreement"). The Agreement committed the MdTA to fund a "Personal Patrol Vehicle program" (sometimes referred to as the "PPV program" or "take-home vehicle program"), whereby each officer of the MdTA Police Force was to receive a "personally-assigned patrol vehicle" for the officer's official use and for commuting. Pursuant to the Agreement, the FOP was obligated to request the withdrawal of proposed State legislation authorizing the MdTA and its police officers to engage in collective bargaining.
In 2007, the MdTA informed the Lodge that it would not proceed with the PPV program.[1] In response, the Lodge and eleven individual MdTA police officers, appellants,[2] filed suit in the Circuit Court for Baltimore County against the MdTA, the State of Maryland, the "Maryland Transportation Authority Board,"[3] the MdTA's Executive Secretary, its Chairman,[4] and nine individual current and former MdTA *1179 members,[5] seeking relief on the basis of breach of contract and promissory estoppel.
The MdTA moved to dismiss the Lodge's Complaint. It asserted that the Agreement was not a valid contract, nor could it be enforced by promissory estoppel.
After reviewing documentary submissions from the parties, the circuit court granted summary judgment in favor of the MdTA. It also denied as moot a motion by the MdTA to disqualify appellants' counsel due to alleged ethics violations. The court subsequently denied the Lodge's motion for reconsideration. This appeal followed.
The Lodge presents four questions, which we have reformulated as a single inquiry: Did the circuit court err in determining that the Agreement was legally unenforceable and on that basis granting summary judgment to the Authority?[6] The MdTA has noted a conditional cross-appeal, pertaining to the denial of its motion to disqualify appellants' counsel. It asks:
If the Court remands this case (which it should not), is it appropriate to disqualify the Lodge's counsel, and exclude certain evidence, due to ethical violations relating to the retention of the former Maryland Transportation Authority police chief as a consultant to the Lodge in this litigation?
For the reasons that follow, we shall affirm in part and reverse in part as to the grant of summary judgment. In addition, we shall vacate the denial of the Authority's motion to disqualify, and remand to the circuit court for consideration on the merits.

I. Background of the MdTA
Although the MdTA has been featured in a handful of prior reported cases,[7] we *1180 have not uncovered any case that has comprehensively described the agency and its functions. In the context of this case, an overview of the agency, and what appellants describe as its "uniquely independent budgetary authority," will be helpful to an analysis of the issues.[8]
The MdTA is an agency created by statute.[9]See Md.Code (2008 Repl.Vol., 2009 Supp.), § 4-201 of the Transportation Article ("Transp.").[10] It was established by the General Assembly in a 1970 enactment, effective July 1, 1971. See 1970 Md. Laws, ch. 526. See also Bugg v. MdTA, 31 Md. App. 622, 632, 358 A.2d 562, cert. denied, 278 Md. 717 (1976), cert. denied, 429 U.S. 1082, 97 S.Ct. 1088, 51 L.Ed.2d 529 (1977). "Acting on behalf of the Department [of Transportation]," the Authority is responsible for "the supervision, financing, construction, operation, maintenance, and repair of transportation facilities projects," Transp. § 4-204(a), which principally consist of the major toll-producing bridges, tunnels, and thoroughfares of the State. See Transp. § 4-101(h) (defining "transportation facilities projects").[11]
Although the enabling act for the Authority is codified in the Transportation Article, and, as noted, the MdTA acts "on behalf of" the Department of Transportation ("DOT" or the "Department"), the MdTA is not included as a unit of the DOT. See Transp. § 2-107 (enumerating units of the DOT, without listing the MdTA); Transp. § 4-201 (establishing the MdTA, without stating that it is "in the Department"). Rather, the MdTA is an independent agency. But see MdTA v. King, 369 Md. 274, 276, 799 A.2d 1246 (2002) (without citation of authority, describing MdTA as "a unit" of the Department of Transportation). It is comprised of the Secretary of Transportation, sitting ex officio as its Chairman, and eight members appointed by the Governor, with the consent of the Senate, to four-year terms. See Transp. § 4-202.[12]
*1181 As noted, the Agreement was signed on behalf of the MdTA by its "Executive Secretary." The position of Executive Secretary is not established by statute or regulation, but is referred to in various MdTA regulations. It is clear from the context of this case and the various regulations that refer to the position, see, e.g., Code of Maryland Regulations ("COMAR") 11.02.01.02B(2)(f) (Supp. No. 30), that the Executive Secretary is the chief administrator of the Authority.
MdTA finances its transportation facilities projects through the issuance of bonds. See Transp. §§ 4-301 to 4-311. The bonds are secured by trust agreements, Transp. § 4-311(a)(1), which "may pledge or assign all or any part of the revenues of the Authority or of any transportation facilities project...." Transp. § 4-311(a)(2). See Transp. § 4-315 (all revenue bond proceeds and toll revenues are trust funds). In turn, the Authority has the power to establish and collect "rentals, rates, fees, tolls, and other charges and revenues" for the use of its transportation facilities projects. Transp. § 4-312(a)(2). Aside from specific statutory restrictions that we need not catalog, "the rentals, rates, fees, tolls, and other charges and revenues are not subject to supervision or regulation by any instrumentality, agency, or unit of this State or any of its political subdivisions." Transp. § 4-312(c)(1). These revenues are applied as specified in the trust agreements. Transportation § 4-313 establishes a "Transportation Authority Fund" into which all revenues derived from transportation facilities projects are to be deposited, "except to the extent that they are pledged under an applicable trust agreement...." To the extent permitted by the trust agreements, funds that are available after providing for the Authority's debt service may be transferred to the DOT's general "Transportation Trust Fund to be used as appropriated by the General Assembly...." Transp. § 4-313(c).[13]
In Wyatt v. State Roads Commission, 175 Md. 258, 1 A.2d 619 (1938), the Court of Appeals reviewed the similar, predecessor scheme for financing, construction, and management of the State's toll infrastructure under the aegis of the State Roads Commission (the "Commission"). Like the MdTA today, the Commission was entrusted with funding the State's major transportation facilities by issuing bonds, and then charging tolls for the public's use of the facilities so as to "provide a fund sufficient... to pay the cost of maintenance... and the bonds and interest as they should become due." Id. at 262, 1 A.2d 619. The Court observed that the statute contained, "accordingly, no provision for resort to taxation for any outlay on the projects...." Id. The question before the Court was whether this program of "self-paying *1182 construction" passed constitutional muster. Id. at 265, 1 A.2d 619. The Court determined that it did.
In particular, the Court held that the scheme did not amount to "contracting a debt without annual taxation to meet it," prohibited by Article III, § 34 of the State Constitution. Id. at 264, 1 A.2d 619. It reasoned that the bonds were to be paid entirely out of toll revenues, and the bonds at issue did not establish "any obligation on the State to repay principal or interest"; rather, the bondholders' only recourse was (and remains today, see Transp. §§ 4-316 & 4-319) against the revenues of the agency, and not the general fisc of the State. Wyatt, 175 Md. at 265, 1 A.2d 619. Because there was "no contract to add to the burden of the taxpayers of the State present or future, none to pay anything out of taxes, and no debt incurred for which taxes could be levied," the agency's financial obligations were not "debts" of the State, in the constitutional sense. Id.
Nor did the Commission's plenary authority over collection and disbursement of toll funds violate Sections 2 and 3 of Article VI of the State Constitution, which respectively vest in the Comptroller the "general superintendence of the fiscal affairs of the State," and direct that the Treasurer "shall receive and keep the moneys of the State." See Wyatt, 175 Md. at 269, 1 A.2d 619. The Court explained: "The fund from tolls will be one coming into existence only for the special, peculiar, application to the bonds, and is completely appropriated to that purpose.... The State will have no right to the fund, and it would be a misapplication to put it into the ordinary channels for state revenues." Id.
Thereafter, the Attorney General opined that "[t]he General Assembly may enact legislation requiring the Authority to present its proposed budget and other financial documents to the General Assembly for review." 70 Op. Att'y Gen. 229, 229 (1985). But, the Attorney General determined that the Legislature may not subject the Authority's revenues to the appropriations process.[14]Id. See also Md.Code (2009 Repl.Vol.), § 7-110(b)(2) of the State Finance & Procurement Article ("S.F.P.") (requiring budget books to include, "for information," a summary of MdTA's capital and operating expenditures).[15]
In furtherance of its independent management of the State's toll infrastructure, the MdTA is statutorily granted the power to "acquire, hold, and dispose of property." Transp. § 4-205(b). Notably, in the context of this case, with limitations not relevant here, the Authority "may make any contracts and agreements necessary or incidental to the exercise of its powers and performance of its duties." Transp. § 4-205(c)(1).
Moreover, the MdTA is authorized to "employ and fix the compensation of attorneys, consulting engineers, accountants, *1183 construction and financial experts, superintendents, managers, and any other agents and employees that it considers necessary to exercise its powers and perform its duties." Transp. § 4-205(d)(1). The expense of employing such persons "may be paid only from revenues or from the proceeds of revenue bonds issued by the Authority." Transp. § 4-205(d)(2). In a 1988 opinion, the Attorney General concluded that these statutory provisions granted the MdTA "independent authority to hire and set the compensation of [its] employees," in contrast to the DOT, which was subject (in varying degrees) to the requirements of the Merit System Law (then codified in Article 64A of the Annotated Code). See 73 Op. Att'y Gen. 285, 285 (1988).[16],[17]
The MdTA also has the power to adopt rules and regulations. Transp. § 4-205(f). And, it enjoys a "catch-all" grant of authority, *1184 empowering it to "do anything else necessary or convenient to carry out the powers granted" to it by statute. Transp. § 4-205(g).
Among the MdTA's employees are the members of the Maryland Transportation Authority Police Force ("MdTAP"). Transp. § 4-208. The commanding officer of the MdTAP is its Chief. Forbidden Meeting Room Transp. § 4-208.1.
The lineage of the [MdTAP] can be traced back to several police forces that were created beginning in the middle of the 20th century to patrol various transportation facilities in Marylandincluding the State Roads Commission Bridge Guards, the Harbor Tunnel Special Police, the Maryland Port Authority Special Police, the State Aviation Administration Police, and others. By 1998, these various law enforcement agencies had all been absorbed into what is now known as the Maryland Transportation Authority Police.
92 Op. Att'y Gen. 51, 51 (2007) (citation omitted).
By statute, the MdTAP is charged with providing police services to the Authority, the Maryland Aviation Administration, and the Maryland Port Administration. Transp. § 4-208(e). MdTAP officers have "all the powers granted to a peace officer and a police officer of this State." Transp. § 4-208(a)(2). They may exercise those powers "on property owned, leased, or operated by or under the control of the [MdTA], Maryland Aviation Administration, and Maryland Port Administration," Transp. § 4-208(b)(1), and, under some circumstances, within 500 feet of such property. Transp. § 4-208(b)(2)-(3). Ordinarily, MdTAP officers may not exercise police powers on any other property. See Transp. § 4-208(b)(4). However, there is an exception authorizing the use of police power on other property, if "[o]rdered to do so by the Governor." Transp. § 4-208(b)(4)(iii). In 2004, the Governor issued such an order (which remains in effect), authorizing the MdTAP to exercise police power "to enhance the protection and safety of all publicly owned, commercial, and/or common carrier transportation assets throughout the State." COMAR 01.01.2004.28B (Supp. No. 28). In 2007, the Attorney General interpreted this expanded grant of jurisdiction to include authorization for MdTAP officers to "be assigned to patrol MARC trains and stations, including Amtrak stations in Maryland," in concert with Amtrak police and other law enforcement agencies with overlapping jurisdiction. 92 Op. Att'y Gen. at 57.
The MdTA is responsible for instituting "rules and regulations governing the operation and conduct of the Maryland Transportation Authority Police Force and of Maryland Transportation Authority police officers." Transp. § 4-208(d).

II. Factual and Procedural Background
The Lodge instituted suit on June 29, 2007. As noted, the complaint contained two counts: breach of contract and promissory estoppel. Our recitation of the facts is drawn primarily from the plaintiffs' complaint, as amended.[18]
According to the complaint, for "approximately three years" the Lodge had been "seeking collective bargaining rights by seeking to introduce legislation providing for collective bargaining." Through its efforts, the FOP obtained the introduction of collective bargaining legislation during *1185 the 2006 session of the Maryland General Assembly.[19] The Lodge had also "conducted extensive research into offering each Maryland Transportation Authority Police Officer a personally assigned take home patrol vehicle, to induce recruitment and retention of police officers."
On February 27, 2006, during the legislative session, Trent M. Kittleman, then the Executive Secretary of the Authority, met with then-MdTAP Chief Gary L. McLhinney; MdTA Deputy Executive Secretary Dan McMullen; MdTAP Cpl. John Zagraiek, the President of the Lodge; and MdTAP Lt. Kevin Anderson, the Vice-President of the Lodge. At that meeting, Kittleman and Zagraiek signed the Agreement, which took the form of a one-page "memorandum" from Kittleman to Zagraiek, with the subject line, "Personal Patrol Vehicle Program/Collective Bargaining Legislation." The Agreement, a copy of which was attached as an exhibit to the Lodge's complaint, stated:
This afternoon, I met with Cpl. John Zagraiek and Lt. Kevin Anderson, along with Chief Gary McIlhinney [sic] and Dan McMullen. At this meeting, I made a proposal to fund the "Personal Patrol Vehicle Program" ("PPV") as an alternative to the Collective Bargaining Bills that are now before the House and Senate.
Short Background
One of the reasons the MdTA Police support collective bargaining is for recruiting purposes. Since most other police forces have collective bargaining, MdTAP considers not having collective bargaining as a potential disadvantage in the competition for the best recruits.
Another significant recruitment tool MdTAP has requested is the ability to offer each MdTA police officer a personally assigned patrol vehicle. During the recent budget process, Chief McIlhinney [sic] submitted a thoroughly documented request for a three-year phase-in of this program. We were unable to accommodate the request at that time.
Agreement
In essence, the proposal is that the Authority will include the PPV in the next three fiscal year budgets, and in exchange the F.O.P. Lodge # 34 will ask the sponsors to withdraw the collective bargaining bills and will agree not to support collective bargaining legislation in either of the following two years. Below are the specifics of the agreement:
&rtrif; Cpl. Zagraiek, or his designee, on behalf of the F.O.P., will request Del. DeBoy to withdraw HB 1151, his collective bargaining bill, before tomorrow's hearing.
&rtrif; Cpl. Zagraiek, or his designee, on behalf of the F.O.P., will ask Sen. Gianetti [sic] to withdraw SB 722, his companion collective bargaining bill.
&rtrif; Provided the bills are withdrawn, and no collective bargaining legislation covering the MdTAP is passed [in] this session, the Authority will add funds to the FY '07 budget for the first phase of the proposed PPV program, in [an] amount reasonably close to the $3.82 million outlined in the current proposal.
&rtrif; In each of the next two fiscal years, the Authority will continue to fund the three-year phase-in of the PPV, provided that no collective bargaining legislation covering the MdTAP is passed.
&rtrif; The PPV program will be essentially the program outlined in the notebook *1186 prepared by the MdTAP, in conformance with all laws and regulations.
Following the signing of the Agreement, the House and Senate bills providing for collective bargaining rights for MdTAP officers were withdrawn by their sponsors, at the Lodge's request.[20]
According to the complaint, the Authority held a meeting in April 2006, at which its "members unanimously approved the plan to implement, over a three-year period, a police vehicle take-home program for sworn Authority police personnel in exchange for the withdrawal of a bill concerning collective bargaining for sworn Authority Police personnel." The complaint further alleged that, immediately after the signing of the Agreement, the MdTAP began to include "`Take Home Vehicles' on its recruitment pamphlet and recruitment website by listing it first under `Benefits Package.'" In approximately June 2006, the Authority ordered twenty-five vehicles for the PPV program; it took delivery of all twenty-five vehicles as of May 2007.
On January 17, 2007, Martin J. O'Malley succeeded Robert L. Ehrlich, Jr. as Governor of Maryland. Governor O'Malley appointed John D. Porcari as his Secretary of Transportation, and Porcari assumed concomitantly the position of Chairman of the MdTA. In the early weeks of the O'Malley administration, MdTA Executive Secretary Kittleman and MdTAP Chief McLhinney were succeeded, respectively, by Ronald L. Freeland and Marcus L. Brown. Governor O'Malley also appointed three new members to the Authority.[21]
According to the complaint, on May 16, 2007, Secretary Porcari announced his intention "not to move forward with the Personal Patrol Vehicle program," despite the Agreement. At its June 28, 2007 meeting, the Authority voted not to proceed with implementation of the PPV program. Appellants filed suit the next day.
As to the breach of contract claim, the Lodge asserted that the MdTA "offered to implement and fund the Personal Patrol Vehicle program in exchange for Plaintiff's withdrawal of collective bargaining bills and forbearance from supporting collective bargaining...." Further, appellants averred that the Lodge "accepted the Defendants' offer when Sergeant John Zagraiek signed the Memorandum dated February 27, 2006, in his official capacity as the President of the FOP. Plaintiffs' agreement to forego collective bargaining rights was consideration for the Defendants' promise to implement and fund the Personal Patrol Vehicle program." Because Kittleman and Zagraiek both signed the Agreement, and the Authority "unanimously voted on April 20, 2006, to approve the Personal Patrol Vehicle program in exchange for the withdrawal of bills concerning collective bargaining," the Lodge contended that the MdTA "had a duty to comply with the [A]greement...." According to the Lodge, the MdTA "breached the agreement on May 16, 2007, when Porcari... publicly announced ... the intention of the [MdTA] to suspend further performance of the agreement by halting the [PPV] program." Moreover, the Lodge noted that the MdTA "did in fact begin performance of the [A]greement by ordering twenty-five of the vehicles," although "the twenty-five vehicles previously delivered have not been available as take home vehicles." The Lodge asked the court to "enforce the [A]greement and order the *1187 funding and implementation of the Personal Patrol Vehicle program for three years following the date the agreement was signed and then accepted by the [MdTA] on April 20, 2006."
As to the claim of promissory estoppel, the Lodge contended that, by entering into the Agreement, the MdTA "made a clear and definite promise to implement and fund the Personal Patrol Vehicle program for three years," which "induced actual and reasonable action" by appellants, who relied on the MdTA's promise to their detriment. In the view of the FOP, the MdTA should have foreseen that its promise to fund the PPV program "would induce action on the part of persons to accept employment with the [MdTAP] and/or convince persons to forego other employment options and remain employed with the [MdTAP]." In addition, appellants averred that the Lodge acted in reliance on the promise by causing the collective bargaining bills to be withdrawn in the 2006 legislative session, and claimed that it "subsequently has not supported any collective bargaining bills to date."[22]
As to the individual officers/plaintiffs, the complaint alleged that six of them had left the Baltimore City Police force after several years of employment and had joined the MdTAP in September 2006, based on the MdTAP's "advertisement of `take home cars' on its recruitment brochure, website, and during orientation." Some averred that they could have retired substantially earlier, or could have accepted employment with other police agencies offering take-home cars or other "competitive benefits," but chose to join the MdTAP because of the PPV program. Notably, several of the individual plaintiffs were assigned to duty at the Harry W. Nice Memorial Bridge, one of the toll bridges operated by the MdTA, situated in southern Charles County. They alleged that their commutes to the Nice Bridge ranged between 50 and 121 miles each way, and claimed, inter alia, that they had accepted assignment to that duty station because the "remote" Nice Bridge station "was designated as the first location to receive take home cars."
In sum, the plaintiffs urged that they had "suffered a detriment which can only be remedied by the enforcement of the promise." They requested that the court "enforce the promise of the Defendants to fund and implement the Personal Patrol Vehicle program...."
On August 20, 2007, the MdTA filed a motion to dismiss for failure to state a claim upon which relief could be granted.[23] The Authority asserted several grounds for dismissal of the breach of contract claim. First, it argued that the Agreement was too indefinite to be enforced. Second, it asserted that the Agreement was unenforceable as against public policy, for several reasons: (a) it was a contract for the exercise of personal influence over legislators, and/or was contingent upon the defeat of legislation; (b) the Agreement was ultra vires, because the statutory grant of authority to the MdTA did not authorize it to influence legislation, and was thus barred by sovereign immunity; (c) the Agreement was in essence a contract to procure the services of the Lodge *1188 to lobby the General Assembly, but it failed to comply with State law governing procurement contracts; and (d) the Agreement was essentially a collective bargaining agreement, and the MdTA had no statutory authority to collectively bargain with its employees, nor did the Agreement observe the procedures mandated for State employee collective bargaining.
As to the promissory estoppel claim, the MdTA contended that promissory estoppel could not be asserted against a State agency. But, even if it could, the MdTA alleged that: (a) plaintiffs had not adequately stated a claim satisfying the elements of promissory estoppel, and (b) the promissory estoppel claim was barred for the same reasons that rendered the Agreement unenforceable as a contract.
In their opposition, appellants argued: "The Agreement is not too indefinite to be enforced, as it incorporates a comprehensive Proposal extensively explaining the cost of the program and ... its benefits...." They submitted as an exhibit to the Opposition a large binder that they asserted was the "notebook" identified in the Agreement as the "thoroughly documented request" for the PPV program. Other exhibits to the Opposition included a series of "PowerPoint" slides and an "executive summary" regarding the PPV program, drawn from the binder; a copy of the minutes of the April 20, 2006, meeting of the Authority, showing that the Authority had "unanimously approved" the PPV program "in exchange for the withdrawal of a bill concerning collective bargaining"; and affidavits of McLhinney, Zagraiek, and Anderson, describing the circumstances in which the PPV proposal was developed and the Agreement was signed, as well as the FOP's interactions with members of the Legislature regarding the proposed collective bargaining legislation.
The Lodge also addressed the MdTA's arguments that the Agreement offended public policy. In the Lodge's view, "the FOP did not agree to exercise its personal influence over particular legislators to defeat the legislation. The FOP merely agreed to request that the two bills it had previously submitted be withdrawn," because it believed that the PPV program "was more beneficial than non-binding collective bargaining in obtaining and retaining qualified officers." Moreover, the Lodge asserted that "the FOP members presenting facts to the Legislature and making this request, were not being paid under the Agreement for `lobbying'...."
In addition, the Lodge disputed the MdTA's argument that the Agreement was ultra vires. Noting that the Agreement had been signed by the Authority's Executive Secretary and approved unanimously by the Authority, the Lodge asserted the Agreement was within the scope of the MdTA's powers. According to the Lodge, "the Agreement did not call on the MdTA to spend its funds in hiring a private agent to lobby the General Assembly...."
As to the Authority's argument that the Agreement failed to comply with the State procurement statutes, the Lodge argued that "the only procurement involved in this case is the procurement of the vehicles to use in the PPV program, which the MdTA has authority to purchase." Further, the Lodge rejected the Authority's characterization of the Agreement as a collective bargaining agreement, stating: "[T]he MdTA was not entering into a binding agreement with its employees on a collective basis establishing working conditions. The PPV program was a means to furthering recruitment and retention of qualified police officers, and increasing efficiency of the MdTA Police Force."
Finally, with respect to the promissory estoppel claim, the Lodge sought to distinguish the cases cited by the MdTA for the proposition that promissory estoppel cannot *1189 be asserted against the State. It also posited: "A statement by the Police Chief as well as a list of benefits provided on an official website are more than authoritative sources for an officer to rely on.... [T]he authoritative nature of the sources of information support[s] the element of `reasonable reliance.'"
On September 6, 2007, the MdTA filed a "Motion to Disqualify Plaintiffs' Counsel and Exclude Evidence." The Authority claimed that McLhinney, MdTAP's former Police Chief, was hired by the FOP "to work as a consultant on this matter, notwithstanding McLhinney's substantial involvement in this matter on behalf of MdTA." Claiming that such conduct violated Rules 3.4 and 4.4 of the Maryland Rules of Professional Conduct, appellees sought disqualification of plaintiffs' counsel and the evidentiary exclusion of any testimony or statements by McLhinney, as well as documents that plaintiffs' attorneys had derived from their employment of McLhinney. The Lodge responded to the MdTA's Motion to Disqualify on October 2, 2007, contending that McLhinney's employment by FOP's counsel did not violate the Rules of Professional Conduct. The Lodge offered an affidavit of McLhinney, dated September 23, 2007, to support that assertion.
After some procedural turns that are not relevant to the issues on appeal, the two motions were heard on July 15, 2008. As to the MdTA's argument that the agreement was too indefinite to enforce, the judge referred to the "thoroughly documented request" for the PPV program referenced in the Agreement and asked, "[I]sn't that a matter of proof? ... Assuming that ... everyone agrees, yes the thoroughly documented request existed, and this is it, then doesn't that eviscerate your argument?" The court also commented:
When a Court looks at a contract, one of two things has to happen. Either the Court finds as a matter of law that the contract is valid or invalid, or the Court finds that there is an ambiguity, in which case it becomes a question of fact for the trier of fact, and the Court simply can't make a decision on its own.... I believe that the situation in this case is that ... the State has raised the issue of ambiguity, which would have to be considered by the trier of fact in the case if it were tried.
The MdTA argued that the Agreement was subject to State procurement law as a contract to procure servicesi.e., the Lodge's lobbying of the General Assembly. The Lodge's counsel responded that "this was not a contract to procure lobbying services from the FOP. It was an agreement to procure cars." (Emphasis added.) Further, the Lodge contended that the MdTA was not subject to State procurement law in purchasing vehicles, because the Authority "is unique in that sense in that they are independent of all State government.... The MdTA is unique in the fact that its budget comes from the revenues raised through tolls...." The court remarked:
Either way, doesn't the contract have to be approved? ...
* * *
Whether it[']s services or materials, they still have to buy them from the lowest responsible bidder. They can't buy them from the ... secretary's brother-in-law who's going to get a 200 percent mark up on the item when somebody else would give the State a better deal.
* * *
[W]hen you're spending the State's money, it has to be done through the procurement process, and ... an independent agency can't waste the money.
The MdTA's arguments that the Agreement was unenforceable as against public policy found purchase with the court. The *1190 court determined that the Agreement was "completely unenforceable on the ground of sovereign immunity." It also said: "It seems to me [the Agreement] violates the procurement laws, and the collective bargaining laws that are well established in our State." Accordingly, the court stated that it would grant the motion to dismiss. As to the MdTA's motion to disqualify plaintiffs' counsel, the court stated: "It's moot. The Court has dismissed the case."
Thereafter, on July 21, 2008, the court entered a written order, stating that "the motion, pursuant to Rule 2-322(c), is treated as a motion for summary judgment." It also said that, "[u]pon consideration of the motion of ... the Maryland Transportation Authority and its members, to dismiss plaintiff's Second Amended Complaint, the plaintiffs' opposition thereto, and the exhibits and affidavits attached to plaintiffs' opposition memorandum," and "finding no dispute of material fact," the defendants were "entitled to judgment as a matter of law."
On July 25, 2008, appellants filed a motion for reconsideration, in which they asserted that "proper procurement procedures were followed when purchasing vehicles for the take-home car program." The Lodge complained that, at the hearing, "instead of focusing on issue[s] surrounding lobbying, the court inquired mostly about the issue of proper procurement procedures when purchasing the cars for the take-home car program." Appellants also suggested that they had been ambushed by that issue.
Contrary to its position at the hearing, the Lodge conceded that, "[l]ike any State agency, the MdTA is subject to the State Finance and Procurement Article when making purchases." But, the Lodge asserted: "Appropriate procurement procedures were followed and the vehicles for the take-home car program were purchased through a purchase contract already established by the Department Budget [and] Management after the MdTA approved the funds to be spent on the purchase." According to the FOP, "there were contracts that were already established by the State to purchase the vehicles from a particular manufacturer and supplier, and procurement procedures had already been followed. Because the [vehicle procurement] contract was already established, the Authority could purchase vehicles through these contracts, without having to re-engage in the procurement process."
In support of its motion, the Lodge attached an affidavit of McLhinney, describing the purchase of the vehicles for the PPV program, and an affidavit of former MdTAP Major Martin Uzarowski, who averred that, until his retirement from the MdTAP in December 2006, he was in charge of the MdTAP's budget processes as "Chief of the Support Services Bureau" for the MdTAP. Uzarowski described the purchase of the vehicles for the PPV program and said: "[I]f we were purchasing vehicles through already-established contracts, MdTA would not have to go through any further procurement procedures[.]"
In its opposition, the MdTA suggested that the Lodge had misconceived the basis of the court's grant of summary judgment, and asked the court to clarify the grounds for its ruling. In an Order of October 7, 2008, the court denied appellants' motion for reconsideration. It also stated that it "enter[ed] judgment in favor of the defendants for the reasons stated in the defendants' motion and the memoranda submitted in support thereof."
We shall include additional facts in our discussion.

III. Discussion
We begin our discussion with the observation that the Agreement between *1191 the Authority and the Lodge seems quite unusual. Indeed, if the MdTA were a budgeted agency, subject to the appropriations process, and did not enjoy its independent structure, the Agreement would likely be unenforceable for several reasons. See, e.g., S.F.P. § 7-237(b) (prohibiting State officers to "make or participate in making for any purpose a contract that purports to bind the State to pay any amount unless money has been appropriated for that purpose and remains unspent" or "incur a liability or spend money in excess of the applicable appropriation"); Md.Code (2009 Repl.Vol.), § 3-205(e) of the State Government Article ("S.G.") (prohibiting a Governor whose term is ending to submit a budget binding the next administration). Nevertheless, upon close examination, and in light of the applicable standard of review, none of the particular grounds advanced by the Authority invalidate the Agreement on contract grounds.[24]

A. Standard of Review
Appellants submitted numerous exhibits in connection with their opposition to appellees' motion to dismiss, which the court considered. Therefore, the circuit court appropriately considered appellees' motion to dismiss as a motion for summary judgment. See Hrehorovich v. Harbor Hosp. Ctr., 93 Md.App. 772, 788, 614 A.2d 1021 (1992), cert. denied, 330 Md. 319, 624 A.2d 490 (1993); Md. Rule 2-322(c) ("If, on a motion to dismiss ... matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 2-501....").[25]
*1192 We review, de novo, an order granting summary judgment. Myers v. Kayhoe, 391 Md. 188, 203, 892 A.2d 520 (2006). In our review, we construe the record in the light most favorable to the non-moving party. Bednar v. Provident Bank of Md., Inc., 402 Md. 532, 542, 937 A.2d 210 (2007). Like the appellees, we shall assume, for the purpose of our review, the veracity of appellants' factual allegations, and proceed to determine whether the trial court's decision was legally correct. See Lippert v. Jung, 366 Md. 221, 227, 783 A.2d 206 (2001); Williams v. Mayor & City Council of Balt., 359 Md. 101, 114, 753 A.2d 41 (2000).
"`Ordinarily, an appellate court should review a grant of summary judgment only on the grounds relied upon by the trial court.'" Sadler v. Dimensions Healthcare Corp., 378 Md. 509, 537 n. 10, 836 A.2d 655 (2003) (citation omitted). At the hearing, the circuit court was skeptical that the Agreement was too indefinite to be enforced. The court seemed to rest its decision on other grounds advanced by the MdTA. Nevertheless, it is usually "the written order that constitutes the judgment of the court...." In re Justin D., 357 Md. 431, 445, 745 A.2d 408 (2000). In the order denying appellants' motion for reconsideration, the court stated that summary judgment was granted "for the reasons stated in the defendants' motion and the memoranda submitted in support thereof." Accordingly, we shall consider all of the grounds advanced by appellees for dismissal of the suit.

B. Sovereign Immunity
Because this case involves a claim against a State agency, the doctrine of sovereign immunity provides a backdrop for all of the contentions. "Grounded in ancient common law, the doctrine of sovereign immunity bars individuals from bringing actions against the State, thus protecting it from interference with governmental functions and preserving its control over its agencies and funds." Condon v. State, 332 Md. 481, 492, 632 A.2d 753 (1993).
"Sovereign immunity `is applicable not only to the State itself, but also to its agencies and instrumentalities, unless the General Assembly has waived the immunity either directly or by necessary implication.'" Proctor v. Washington Metro. Area Transit Auth., 412 Md. 691, 709, 990 A.2d 1048 (2010) (citation omitted). In Bugg, supra, 31 Md.App. 622, 633, 358 A.2d 562, this Court held: "It is beyond question that the Maryland Transportation Authority is an agency of the State and as such enjoys the same sovereign immunity as does the State...."
In various statutes, the Legislature has waived the State's sovereign immunity, under limited conditions.[26] "If the State chooses, by legislative action, to waive its sovereign immunity, [the courts] strictly construe[] the waiver in favor of the State." Proctor, 412 Md. at 709, 990 A.2d 1048. Thus, "`[a] conditional or partial waiver of sovereign immunity certainly is not intended to put governmental entities on exactly the same footing'" as private *1193 parties. Rios v. Montgomery County, 386 Md. 104, 135-36, 872 A.2d 1 (2005) (citation omitted).
Of import here, the State has waived its sovereign immunity under limited circumstances in regard to claims based on written contracts. See Magnetti v. Univ. of Md., 402 Md. 548, 560-562 & n. 6, 937 A.2d 219 (2007). The waiver of sovereign immunity is embodied in S.G. §§ 12-201 et seq.[27] S.G. § 12-201(a) provides:
Except as otherwise expressly provided by a law of the State, the State, its officers, and its units may not raise the defense of sovereign immunity in a contract action, in a court of the State, based on a written contract that an official or employee executed for the State or 1 of its units while the official or employee was acting within the scope of the authority of the official or employee.[28]

C. Indefiniteness
Appellants contend that the "Agreement is a legally enforceable contract because it is not vague or uncertain in its essential terms." They posit:
"[T]he Agreement states a definite amount of $3.82 Million to be spent on the program per year, and in addition, the Agreement states that "The PPV program will be essentially the program outlined in the notebook prepared by the MdTAP." The Agreement incorporates the Proposal to govern the implementation of the program, which breaks down the cost of the program and provides for vehicles to be purchased over the three years."
Appellants add: "The specifics of the amount to be spent each year are easily referred to in the Proposal which is incorporated into the last line of the Agreement."
Appellees counter: "The circuit court appropriately granted the Authority judgment on the Lodge's breach of contract claim because the alleged agreement is too indefinite to enforce." Claiming that the "essential terms are lacking or unclear," appellees posit: "The purported agreement does not specify how many patrol cars the Authority was to supply, or when, or to which categories or classifications of Authority Police officers. There also is no specification of make, model, size, type, or specialized features of the law enforcement vehicles to be purchased." In addition, appellees argue:
The proposed cost of the program, "$3.82 million" in the first year of what appears to have been contemplated as a three-year program, is "outlined" in a proposal that is neither incorporated into the "agreement" nor attached to the complaint. Indeed, it is unclear from the face of the agreement whether the multi-million dollar cost is for the entire proposed "three-year phase-in," or only for the first year. If the latter, then the agreement contains no indication what the cost to the State and its taxpayers would be for the subsequent two years of the "phase-in," or for any ensuing *1194 years of the program once established, although it could well exceed $12 million.
Appellees add:
Here, the absent key terms include the number of vehicles to be purchased, the type of vehicles to be purchased, the manner in which they were to be assigned, and the total cost of the program. Absent such terms, no binding contract has formed, because there was no specific promise to which the Authority can be bound.
Further, appellees maintain that appellants are "mistaken" as to their claim that the notebook "could supply the specifics...." They argue that "while the memorandum states that the PPV program would be `essentially' the program described in the `notebook,' a program that is `essentially' the same is not the same, and the [Agreement] does not specify how it would differ." In addition, they insist that the Agreement violates the Statute of Frauds, set forth in § 5-901 of the Courts and Judicial Proceedings Article of the Md.Code (2006 Repl.Vol., 2009 Supp.). They assert: "Under the statute of frauds, topically related documents that nevertheless fail to supply essential contract terms are insufficient to satisfy the statute of frauds."
It is well established that an enforceable contract must "express with definiteness and certainty the nature and extent of the parties' obligations." County Comm'rs for Carroll County v. Forty West Builders, Inc., 178 Md.App. 328, 377, 941 A.2d 1181 (citing Canaras v. Lift Truck Servs., Inc., 272 Md. 337, 346, 322 A.2d 866 (1974)), cert. denied, 405 Md. 63, 949 A.2d 652 (2008). See Kiley v. First Nat'l Bank, 102 Md.App. 317, 333-34, 649 A.2d 1145, cert. denied, 338 Md. 116, 656 A.2d 772 (1995), cert. denied, 516 U.S. 866, 116 S.Ct. 181, 133 L.Ed.2d 120 (1995). Put another way, "`[a] court cannot enforce a contract unless it can determine what it is.'" First Nat'l Bank of Md. v. Burton, Parsons & Co., Inc., 57 Md.App. 437, 450, 470 A.2d 822 (citation omitted), cert. denied, 300 Md. 88, 475 A.2d 1200 (1984). "If the contract omits an important term or is too vague with respect to essential terms, the contract may be invalid." Forty West, 178 Md.App. at 378, 941 A.2d 1181.
"Vagueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement have often been held to prevent the creation of an enforceable contract." ARTHUR L. CORBIN, ET AL., 1 CORBIN ON CONTRACTS § 4.1, at 525 (rev. ed.1993, 2008 Spring Cum.Supp.) ("CORBIN"). See Schloss v. Davis, 213 Md. 119, 123, 131 A.2d 287 (1957) (a "contract may be so vague and uncertain as to price or amount as to be unenforceable"); see also RESTATEMENT (SECOND) OF CONTRACTS, § 33(1), at 92 (1981) ("RESTATEMENT") ("Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.") As Professor Williston's treatise states: "It is a necessary requirement that an agreement, in order to be binding, must be sufficiently definite to enable the courts to give it an exact meaning." 1 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 4:21, at 634 (4th ed.1990, 2009 Supp.) ("WILLISTON").[29] In Robinson v. Gardiner, 196 Md. 213, 217, 76 A.2d 354 (1950), the Court explained:
Of course, no action will lie upon a contract, whether written or verbal, where such a contract is vague or uncertain *1195 in its essential terms. The parties must express themselves in such terms that it can be ascertained to a reasonable degree of certainty what they mean. If the agreement be so vague and indefinite that it is not possible to collect from it the intention of the parties, it is void because neither the court nor jury could make a contract for the parties. Such a contract cannot be enforced in equity nor sued upon in law. For a contract to be legally enforceable, its language must not only be sufficiently definite to clearly inform the parties to it of what they may be called upon by its terms to do, but also must be sufficiently clear and definite in order that the courts, which may be required to enforce it, may be able to know the purpose and intention of the parties. (Citations omitted.)
Nevertheless, "courts are reluctant to reject an agreement, regularly and fairly made, as unintelligible or insensible." Quillen v. Kelley, 216 Md. 396, 407, 140 A.2d 517 (1958). Because the "law ... leans against the destruction of contracts because of uncertainty[,] ... courts will, if possible, so construe the contract as to carry into effect the reasonable intention of the parties if that can be ascertained." Id. See also 1 WILLISTON, § 4:21, at 650 ("A court will, if possible, interpret doubtful agreements by attaching a sufficiently definite meaning to a bargain if the parties evidently intended to enter into a binding contract.") But see Bond v. Weller, 141 Md. 8, 11, 118 A. 142 (1922) (finding that, in the context of a land sale contract, the absence of any indication in the contract as to the amount of the loan that would be secured made the contract "incomplete, indefinite and uncertain").
As we have seen, the Agreement provides: "The PPV program will be essentially the program outlined in the notebook prepared by the MdTAP...." However, the Agreement does not specify a dollar amount for the second and third year of the PPV program. Nor does it specify the number, cost, or type of vehicles for the PPV program. Appellees view these omissions as fatal flaws.[30]
Appellants contend: "As to the supplier of the cars, the Department of Budget and Management would be charged with selecting the appropriate manufacturer or supplier. Thus, the supplier of the cars being ordered would also not be included in the Agreement because that decision was not the FOP's to make." Moreover, as appellants point out, the Agreement refers to the notebook, which they describe as a "comprehensive proposal which identifies a definite cost and number of vehicles to be purchased." As an exhibit to their Opposition to appellees' motion, appellants submitted the binder that they assert is the "notebook" referred to in the Agreement, and the MdTA did not appear to dispute that the binder is the "notebook."[31]
In our view, the Agreement sufficiently expresses, with definiteness and certainty, the nature and extent of the parties' obligations. A contract "`is not *1196 rendered unenforceable merely because the parties do not supply every conceivable detail or anticipate every contingency that may arise.'" Forty West, 178 Md.App. at 381-82, 941 A.2d 1181 (citation omitted). Even if the Agreement, standing alone, contained insufficient detail to be enforceable, the Agreement's reference to the "notebook," and its explicit indication that "the PPV program will be essentially the program outlined in the notebook," make clear that the "notebook" was incorporated by reference into the Agreement,[32] and provided the details of the program that the MdTA was agreeing to implement. The description of the PPV program contained in the notebook is clear enough, in our view, to form the basis of a contract.
The binder contains a draft "Personal Patrol Vehicle Directive," Tab 1, specifying which officers would be eligible to utilize a take-home vehicle, and the acceptable and unacceptable uses of the vehicles. Tab 4 contains a detailed cost estimate for marked and unmarked police vehicles, specifying the cost of the accessories and additional equipment for each vehicle. The cost of a marked vehicle is estimated at $29,770.36, while the estimated cost of an unmarked vehicle is $28,971.76. In addition, the binder reflects a proposal to add 302 cars to the MdTAP vehicle fleet through the PPV program. Of those 302 vehicles, 237 are planned to be marked vehicles, while 65 are planned to be unmarked. Multiplying the number of each type of vehicle by the per-vehicle cost, and then dividing the total capital outlay over three years, the binder arrives at a projected capital cost of "$2,979.579.07" per year, or a "3-Year Phase in Cost per year [of] approx[imately] $3 million."[33] Furthermore, the binder projects that the PPV program will incur an additional $826,047 (i.e., approximately $.82 million) in annual operating costs for maintenance and periodic replacement of fleet vehicles.
Thus, it is clear how the "$3.82 million" figure stated in the Agreement was determined, and it is likewise clear that $3.82 million was the projected annual cost of the program in the second and third years of operation. Given the contents of the binder, there is no merit to the Authority's *1197 contention that the Agreement did not specify "the number of vehicles to be purchased, the type of vehicles to be purchased, the manner in which they were to be assigned, and the total cost of the program."

D. Public Policy
As outlined, appellees sought to dismiss the suit on the ground that the Agreement contravened public policy. Appellants advance four grounds to refute appellees' position. They argue that "[t]he Agreement did not contemplate any improper influence over the Maryland Legislature," nor was it "contingent on the defeat of legislation." Further, they claim that it "was properly ratified by the MdTA and was not beyond the scope of the MdTA's Authority; therefore, the Agreement is not ultra vires and this case is not barred by sovereign immunity." In addition, they assert: "The MdTA did not go outside the strictures of State procurement law because the only procurement proposed in the Agreement was for the purchase of vehicles." Lastly, they argue: "The Agreement and its ratification by the MdTA is enforceable because it was not a collective bargaining agreement subject to statutory preconditions."
As we review these grounds, we are mindful that "Maryland courts have been hesitant to strike down voluntary bargains on public policy grounds, doing so only in those cases where the challenged agreement is patently offensive to the public good, that is, where `the common sense of the entire community would ... pronounce it' invalid." Md.-Nat'l Capital Park & Planning Comm'n v. Wash. Nat'l Arena, 282 Md. 588, 606, 386 A.2d 1216 (1978) (quoting Estate of Woods, Weeks & Co., 52 Md. 520, 536 (1879)) (alteration in original).

1. Contingency/Personal Influence
The MdTA alleged that the Agreement was invalid, as a matter of public policy, because it called on the Lodge to exercise personal influence over legislators, and the "compensation" to the Lodge was contingent on defeat of the collective bargaining legislation. According to the MdTA, those features "exemplif[y], with precision, a particular type of agreement that, for nearly two hundred years, American courts have refused to enforce on grounds of public policy."
In its brief, the Authority suggests that the Agreement bears two "hallmarks" of an "unenforceable bargain to exercise improper influence over the legislative process." First, the agency contends that the "intent or effect" of the Agreement was to "persuade the legislature (or particular legislators) through the use of personal influence, rather than through facts and arguments presented to show that the desired legislative action is good policy." Second, the MdTA points to "the contingent nature of the alleged consideration": it posits that a contract to appeal to lawmakers is unenforceable where "the benefit to the persuading party is contingent upon that party's success in swaying the legislature."
In contrast, the Lodge maintains that the Agreement "did not contemplate any improper influence over the Maryland Legislature." In its view, "[s]imply approaching members of the Maryland Legislature and presenting the facts and arguments... as to why the FOP prefers the PPV program over collective bargaining, does not constitute improper influence." The Lodge states:
FOP members are permitted to advocate certain causes just as any other citizen is permitted to advocate or promote a cause to legislators. A citizen presenting facts or arguments to a legislator will many times be doing so to obtain some benefit.... However, the potential benefit does not result in *1198 transforming the citizen, or in this case the FOP and its members to lobbyists.
Moreover, the Lodge maintains that the Agreement was not an unlawful contingency contract to influence the Legislature, because "the FOP members approaching the Maryland Legislature were not receiving monetary compensation for asking for withdrawal of the two bills." In particular, the Lodge points out that "the Agreement contemplated that John Zagraiek approach the legislature," and notes that Zagraiek, unlike rank-and-file MdTAP officers, "already had the benefit of a vehicle at the time the Agreement was signed." Further, it observes:
The purchase of the vehicles under the PPV program in no way constitutes "payment" to the FOP members presenting the information to the Legislature. The vehicles are property of the MdTA and do not belong to the police officers. In addition, the PPV Program provides vehicles to all police officers of the MdTA and not just those police officers who are also members of the FOP, and not just to those members of the FOP who actually presented the facts to the Legislature.
Finally, the Lodge distinguishes a contract to defeat legislation from the Agreement, which only called for the Lodge to "`ask sponsors to withdraw the collective bargaining bills.'" The Lodge elaborates:
The Agreement did not require the FOP to be successful in "defeating collective bargaining during the 2007 and 2008 sessions." The Agreement only required that the FOP "not agree to support collective bargaining legislation in either of the following two years." This clearly states that the FOP was to refrain from submitting and supporting any additional collective bargaining bills, which cannot be interpreted as "lobbying" or "exerting improper influence over the legislature," when no affirmative action is being taken. (Internal citations omitted.)
In support of its position, the MdTA relies upon a line of cases dating to the 19th century and the first half of the 20th century, which stand for the proposition that a contract that is contingent on the passage of legislation is invalid. The Authority's claim fails because, as we shall explain, the rule of those cases has been significantly relaxed in the intervening decades.
A leading early case on the topic is Trist v. Child, 88 U.S. (21 Wall.) 441, 22 L.Ed. 623 (1874). In that case, Trist had negotiated, on behalf of the United States, the Treaty of Guadelupe Hidalgo, which ended the Mexican-American War in 1848. Id. However, Trist had not been paid for his services. Id. Therefore, Trist submitted a claim to Congress and retained Child to "take charge of the claim and prosecute it before Congress as his agent and attorney." Id. at 442.[34] Under the agreement, Child was to receive 25% of "whatever sum Congress might allow in payment of the claim." Trist, 88 U.S. at 442. Congress ultimately awarded Trist $14,559 for his services, but Trist "declined to pay" Child the contingency fee. Id. Child's son (Child himself had since died) sued Trist, seeking to compel his compliance with the compensation agreement. Id. At trial, the evidence showed that the Childs had "been to see various members of Congress, soliciting their influence in behalf of a bill introduced *1199 for the benefit of Mr. Trist, and in several instances obtaining a promise for it." Id. The trial court ordered Trist to pay $3,639, with interest. Id. at 443.
The Supreme Court reversed, finding that the contract was void as against public policy. Id. at 448-53. The Court observed that "an agreement express or implied for purely professional services is valid." Id. at 450. It noted that this category includes: "drafting the petition to set forth the claim, attending to the taking of testimony, collecting facts, preparing arguments, and submitting them orally or in writing, to a committee or other proper authority, and other services of like character." Id. According to the Court: "All these things are intended to reach only the reason of those sought to be influenced." Id. But, the Court explained that "such services are separated by a broad line of demarcation from personal solicitation, and the other means and appliances which the correspondence shows were resorted to in this case." Id. It determined, id. at 451:
The agreement ... was for the sale of the influence and exertions of the lobby agent to bring about the passage of a law for the payment of a private claim, without reference to its merits, by means which, if not corrupt, were illegitimate, and considered in connection with the pecuniary interest of the agent at stake, contrary to the plainest principles of public policy. No one has a right, in such circumstances, to put himself in a position of temptation to do what is regarded as so pernicious in its character. The law forbids the inchoate step, and puts the seal of its reprobation upon the undertaking.
Another early case, cited by appellees, is Marshall v. Baltimore & Ohio Railroad Co., 57 U.S. (16 How.) 314, 14 L.Ed. 953 (1853). In that case, the B & O Railroad Company procured the services of Marshall, on a contingent-fee basis, to obtain the passage of a bill in the Virginia legislature, granting the railroad company a particular right-of-way. Id. at 331-32. Reviewing the decision of a trial court denying Marshall's recovery, the Supreme Court upheld the trial court's instructions to the jury on the unenforceability of contingent-fee contracts for the passage of legislation, opining that "all contracts for a contingent compensation for obtaining legislation, or to use personal or any secret or sinister influence on legislators, [are] void by the policy of the law." Id. at 336.
These principles have been discussed in a handful of Maryland cases. See Frenkil v. Hagan, 146 Md. 94, 125 A. 909 (1924); Charles H. Steffey, Inc. v. Bridges, 140 Md. 429, 117 A. 887 (1922); Wildey v. Collier, 7 Md. 273 (1854). However, none of the Maryland cases are directly applicable to the case at bar or squarely support the MdTA's position.
Wildey involved a contract to secure a nolle prosequi from the Governor for a criminal charge. 7 Md. at 273. The Court affirmed the trial court's judgment that the contract was unenforceable, explaining that "to shield [the Executive Branch] and protect the community against the improvident exercise of its prerogatives, the law has declared that a recovery cannot be had" on a contract to secure executive clemency. Id. at 279. It observed: "The same reason applies with equal force in support of claims for obtaining the passage of laws by the legislature." Id. But, the Court qualified its statement, remarking: "We do not say that services of that kind may not be compensated when publicly rendered by advocates disclosing their true relation to the subject...." Id. at 279-80. It explained that the advocate was properly denied recovery on the contract because "the onus was certainly on him to show the means by which the governor had been induced to act favorably *1200 upon the application," and to demonstrate that the method of persuasion was legitimate. Id. at 281.
In Steffey, a real estate broker sought to recover from a landlord a commission for facilitating the lease of the landlord's real property to the United States Postal Service. Steffey, 140 Md. at 429-30, 117 A. 887. Applicable postal regulations prohibited any person from facilitating a contract with the Postal Service on a contingency basis. Id. at 432-34, 117 A. 887. The Court held that the commission was not recoverable due to the postal regulations, but noted also that the regulations reflected sound policy against "`agreements for pecuniary considerations to control the business operations of the Government, or the regular administration of justice, or the appointments to public offices, or the ordinary course of legislation.'" Id. at 436, 117 A. 887 (citation omitted).
Frenkil concerned a pipe supplier who hired a "prominent politician" on a contingency basis to negotiate the cancellation of a contract with the United States War Department, but then refused to pay the politician the agreed fee after the negotiations were successful. Frenkil, 146 Md. at 102-03, 125 A. 909. The Court of Appeals explained that the supplier could
lawfully employ an agent to assist him in obtaining relief from a claim of the Government against him, provided the services to be rendered are of a legitimate character. Indeed, the weight of authority supports the view ... that there are certain legitimate services which may be contracted for even in connection with the procurement of government contracts. But such services do not include the use of personal or political influence.
Id. at 104-05, 125 A. 909. Notably, the Court refused the supplier's request to find the contingency contract unenforceable as a matter of law. Id. But, the Court vacated the judgment in favor of the politician and remanded because there was "evidence in the record from which the jury might have found that the service which [the politician] was expected to render was through the use of political influence, and the [supplier] was entitled to have that proposition submitted to the jury." Id. at 105, 125 A. 909.
None of the Maryland cases involved contracts to influence legislative action. Moreover, Wildey suggests that the disfavor of contracts to influence legislation does not invalidate such contracts per se. Rather, the burden is on the party asserting the contract's validity to show the propriety of any influence. See Wildey, 7 Md. at 279-81. Similarly, the Frenkil Court declined to say that a contingent contract to influence a government contracting decision was void as a matter of law; instead, the Court remanded for an evidentiary determination of whether the contracting parties expected the advocate to exert improper "political influence." Frenkil, 146 Md. at 105, 125 A. 909.
These limitations on the general principles articulated in Trist and Marshall presage a shift in doctrine that heretofore has not found definitive expression in reported Maryland decisions. Nevertheless, the shift in the law has occurred in other states. Documenting that shift, Corbin notes that "society always has viewed lobbying as an inherently suspect and unsavory activity, though perhaps a necessity." 15 CORBIN § 84.1, at 334. As Corbin explains: "In earlier times the term `lobbyist' had an ugly sound in American ears, and in many of the earlier cases courts held that a lobbying contract was contrary to public policy if the promised compensation was contingent on success in procuring the targeted legislation." Id. at 338.
Corbin synthesizes the modern view, id. at 337-41 (footnotes omitted):

*1201 In general, courts should not find lobbying contracts contrary to public policy. A lobbying contract is not an agreement with a member of the legislature or any other official. It is a bargain for the employment of a lobbyist who undertakes for compensation to render services in causing the enactment of legislation that the employer desires. Legislators should make decisions on an informed basis. Thus, any contract that has as its purpose the provision of facts and arguments to legislators does not offend public policy. The people who send their representatives to Congress, to a state legislature, or to a city council have a right to be informed as to pending legislation and are legally privileged to appear either in person or by agent to support or to oppose an enactment. Proposed legislation may benefit some they lawfully may urge its enactment and present their arguments. That legislation may injure othersthey . . . may lawfully appear to oppose it. Bills introduced and supported by some pressure group may be injurious to other groups. There are very many lawful purposes, therefore, for which a lobbyist or other legislative agent may be employed and many kinds of service that such a person may render lawfully.
* * *
Without regard to the compensation arrangement, if the services actually in contemplation or actually rendered by the lobbyist, in performance of the bargain, are unlawful in character or are clearly contrary to the public interest, all agree that the bargain is unenforceable. If the services bargained for consist of the exercise of personal or political influence on legislators or officials, made effective by personal solicitation, the bargain may be unenforceable. If that personal influence is used to gain access to the official but the official is lobbied on the basis of the merits of the issue, the contract is enforceable.
These statements apply regardless of the duties of the public officer whose action the lobbying is to affect, and regardless of whether that action is legislative, administrative, or judicial. The statements are true whether the purpose is to induce or to prevent legislation, or is to obtain a decree, an appointment to office, or a public contract.
The shift in the law described by Corbin is not inconsistent with the early Maryland cases we have reviewed. As we have noted, the Court in both Frenkil and Wildey declined to hold that contingent contracts to influence government action are always void as a matter of law. Rather, it was a question of fact whether the contracts contemplated improper influence upon State officials.
Here, the Lodge produced uncontroverted affidavits of Zagraiek, Anderson, and McLhinney, describing advocacy that, on its face, was above-board. Because both the circuit court and this Court are required to view the evidence in the light most favorable to the Lodge, as the non-moving party, Frenkil and Wildey compel the conclusion that judgment as a matter of law on this point was improper.
The MdTA cites two contemporary cases in support of its position. Both are inapposite, because they involved contingent contracts for monetary compensation to influence legislation, where a state statute specifically barred such contracts. See Rome v. Upton, 271 Ill.App.3d 517, 208 Ill.Dec. 163, 648 N.E.2d 1085, 1088 (1995) (relying on statute); Sholer v. State, 149 P.3d 1040, 1046 (Okla.Civ.App.2006) (relying on statute). To be sure, as the MdTA points out, Maryland law governing professional lobbying prohibits a "regulated lobbyist" from being engaged "for lobbying purposes for compensation that is dependent *1202 in any manner on . . . the enactment or defeat of legislation." S.G. § 15-713. Under the statutory scheme, a "regulated lobbyist" is defined primarily by whether the advocate is compensated above certain threshold monetary amounts for engaging in various modes of lobbying. See S.G. § 15-701. As the Lodge observes, the Lodge and its members are not "disinterested parties hired to represent others' interests without any personal stake in the outcome." Moreover, the statute does not apply here (nor does the MdTA contend that it does), because neither the Lodge nor its members are regulated lobbyists.
We are also skeptical of the MdTA's premise that the Agreement calls for "contingent compensation." Indeed, unlike any of the cases on this subject cited by either party or uncovered in our own research, the Agreement does not contemplate the pecuniary compensation of the Lodge or its members. The cases we have seen pertaining to the public policy against contracts for legislative influence involved a contingent financial incentive for the advocate. In this case, what the Lodge obtains as allegedly "contingent compensation" for its advocacy of one policy choice is simply another policy choice. The legislative process inherently involves public policy compromises, which result in advantages for some parties and disadvantages to others, as well as the choice of some policies and the rejection of others. To describe the trade-offs struck in the course of lawmaking as "compensation" on a "contingency" basis is to stretch the meaning of those terms beyond their breaking point.
Although it is not factually on all fours with this case, City of Warwick v. Boeng Corp., 472 A.2d 1214 (R.I.1984), is illuminating. In that case, "[t]he State of Rhode Island had been leasing a building located in the city of Warwick and owned by Boeng" for use as a courthouse. Id. at 1216. The State sought to exercise an option in the lease to purchase the building. Id. Under the applicable statutes, "the legislative body of the municipality in which the land was located [i.e., the City of Warwick] was required to approve the transfer prior to issuance of revenue bonds" by the State. Id. The City refused to recommend approval of the sale, because "sale of the property to a state agency would remove it from the city tax rolls." Id. at 1216-17. The State refused to negotiate payment of the taxes with the city, and so Boeng and the Mayor of Warwick entered into negotiations, the product of which was an agreement by Boeng to pay the city two years' worth of property taxes "`upon the completion of the appropriate municipal legislative action . . . and the sale of the subject real property'" by Boeng to the State. Id. at 1217 (quoting agreement). The Warwick City Council passed the appropriate legislation, and the sale was completed; however, Boeng then refused to pay the two years' worth of taxes, prompting the city to sue for breach of contract. Id. The trial court entered judgment for the city, and Boeng appealed. Id.
The Rhode Island Supreme Court rejected Boeng's contention that "a municipality cannot make a valid contract based upon the payment of money in return for an official's promise to recommend passage of legislation, regardless of the official's intention or the effect of the legislation." Id. at 1218. The court aligned itself with the modern view that, "[g]enerally, in situations in which no improper means are contemplated or bargained for, the bargain is not invalidated merely because the compensation to a party is contingent on the enactment of legislation." Id. The court explained, id.:
The public policy is to ensure that governmental decisions are made in the public interest and not conditioned on *1203 the personal interests or gain of a particular government official.
In the present case, the mayor bargained in the public interest to preserve and protect the tax base of the city. He sought compensation from defendant for the loss to the city of a large yearly tax that would have resulted if the agreement had not been reached and the sale to the [State] approved. There is no allegation or evidence that the mayor or any of the city's agents acted improperly or with anything but the public's interest in mind. A contract that was executed in the public interest without any improper motives on the part of the parties is not against public policy and therefore not void.
City of Warwick resonates here. As in that case, there is no allegation here of any improper motive or consideration. There is no allegation by appellees that Kittleman or the Authority decided to execute the Agreement with "anything but the public's interest in mind." Id. Plainly, the Authority in 2006 determined that it was more beneficial to the public and to the agency to implement the PPV program than to permit collective bargaining by MdTAP officers. Its execution of the Agreement reflects that value judgment. The fact that the MdTA, under new leadership, has now reconsidered that judgment does not, in and of itself, permit the agency to renege on its contractual obligations.
For the foregoing reasons, we hold that the circuit court erred in granting summary judgment on the basis that the Agreement was a contingency contract to influence legislation.

2. Procurement
We next consider the MdTA's contention that summary judgment was appropriate because the Agreement is a contract for the procurement of lobbying services, and therefore invalid because the parties failed to follow State procurement law in executing the contract. In a related argument, the Authority maintains that it has no statutory authority to hire lobbyists, and so the Agreement is ultra vires.
At the motion hearing, the Lodge contended that the Agreement "was not a contract to procure lobbying services from the FOP. It was an agreement to procure cars." Moreover, the Lodge argued that the MdTA's independent budgetary authority permitted the agency to purchase vehicles without submitting to the State procurement process. In its motion for reconsideration, however, the Lodge acknowledged that the purchase of the vehicles was subject to the procurement process, but alleged that the vehicles had been purchased through an existing procurement contract that fully complied with the procurement law.
On appeal, the Lodge resurrects its argument that it is not subject to State procurement law in the purchase of vehicles. Relying on the S.F.P. Article, it asserts:
The definition of procurement includes "the process of . . . obtaining services," while capital expenditures are exempt from the ordinary procurement rules. [S.F.P.] § 11-101(m). Because the Agreement contemplates the procurement of vehicles and not the procurement of the FOP's services . . ., it falls under the category of capital expenditures and is therefore exempt from the procurement rules.
In response, the MdTA argues that "[t]here is no question that the Authority is subject to state procurement laws." We agree.
Maryland's General Procurement Law is set forth in Division II of the S.F.P. Article. A "procurement contract" is defined as "an agreement in any form entered into by a unit for procurement." S.F.P. § 11-101(n). Section 11-202 of the S.F.P. Article *1204 provides that, "[e]xcept as otherwise expressly provided by law," the General Procurement Law applies in a variety of procurement contexts, including "each expenditure by a unit under a procurement contract." To understand the import of these phrases, we refer to the definitions provided by the statute. As relevant here, "procurement" includes, among other activities, "the process of . . . buying or otherwise obtaining supplies [or] services." Id. § 11-101(m)(1). In turn, "supplies" include "tangible personal property," id. § 11-101(w)(1)(ii), and "services" means "the labor, time, or effort of a contractor." Id. § 11-101(t)(1)(i). It "includes services provided by attorneys, accountants, physicians, consultants, and other professionals who are independent contractors." Id. § 11-101(t)(2).[35]
Critically, a "unit," for purposes of procurement law, includes any "entity that is in the Executive Branch of the State government and is authorized by law to enter into a procurement contract." Id. § 11-101(x)(1). Despite the agency's relative independence, we are convinced that the MdTA is an agency "in the Executive Branch of the State government," within the meaning of the General Procurement Law.
To be sure, the MdTA's independent budgetary authority arguably could suggest ambiguity as to whether the agency is a "unit" under the terms of S.F.P. § 11-101(x), considered out of context. See Chesapeake Charter, Inc. v. Anne Arundel County Bd. of Educ., 358 Md. 129, 747 A.2d 625 (2000) (opining that S.F.P. § 11-101(x) was ambiguous as to whether local school boards, which are subject to local budgetary control but are State agencies, are "units" subject to General Procurement Law, but determining that local boards are not "units" because of separate procurement statutes applicable to local boards, and statutory history of those statutes and the General Procurement Law). But, in this case, any arguable ambiguity in that lone statutory provision disappears when we consider the General Procurement Law as a whole. See, e.g., In re Mark M., 365 Md. 687, 711, 782 A.2d 332 (2001) ("When construing a statutory provision within a single statutory scheme, we must consider the statutory scheme as a whole to determine the legislative intent.").
Unlike in Chesapeake Charter, we do not need to consult the legislative history. See Houghton v. Forrest, 412 Md. 578, 590, 989 A.2d 223 (2010) ("[W]e need not investigate the legislative history of the statutory provision, [where] a plain reading of the statute resolves our questions."). This is because the Legislature has explicitly stated that certain specific provisions of the General Procurement Law "do[] not apply to capital expenditures by . . . the Maryland Transportation Authority, in connection with State roads, bridges, or highways." S.F.P. § 12-101(a); see also id. §§ 12-107(a), 12-108(a), 12-202(a). The canon of statutory construction, "expressio unius," governs here: by providing that the MdTA is exempt in certain respects from the General Procurement Law, the General Assembly has indicated that the procurement law applies to the agency in all other respects.[36]See McLean Contracting *1205 Company v. MdTA, 70 Md.App. 514, 521 A.2d 1251 (concluding that construction contractor must resolve procurement contract dispute with MdTA by claim with Board of Contract Appeals), cert. denied, 310 Md. 130, 527 A.2d 51 (1987).
Our determination that the MdTA is generally subject to State procurement law does not end our inquiry, however. The MdTA cites various procurement statutes and regulations that it contends were not followed in regard to the Agreement. We need not catalog these provisions because, by reciting them, the Authority is begging the question. The Lodge does not contend that the procurement regulations were followed. The issue is whether the Agreement is a "procurement contract," subject to the procurement law.
Our research suggests that the question of whether a given contract is a "procurement contract," subject to the General Procurement Law, has been given scant appellate attention. As the Court observed in State v. Maryland State Board of Contract Appeals and Law Offices of Peter G. Angelos, P.C., 364 Md. 446, 773 A.2d 504 (2001) ("Angelos"), the question itself has jurisdictional implications. If the Agreement were a procurement contract, the Lodge would be required to exhaust administrative remedies before seeking judicial relief.[37] As we shall explain, however, the Agreement is not a procurement contract.
Angelos involved a contingent fee contract. The Attorney General hired the Angelos law firm to represent the State in litigation against the tobacco industry. See id. at 449-50, 773 A.2d 504; see also Philip Morris, Inc. v. Glendening, 349 Md. 660, 709 A.2d 1230 (1998); State v. Philip Morris, Inc., 179 Md.App. 140, 944 A.2d 1167, cert. denied, 405 Md. 65, 949 A.2d 653 (2008). After the tobacco litigation settled, the law firm sought payment from the State pursuant to the contingent fee agreement. Angelos, 364 Md. at 450, 773 A.2d 504. The Attorney General denied the firm's claims. Id.
The firm appealed the Attorney General's decision to the State Board of Contract Appeals. Id. at 451, 773 A.2d 504. We pause to note that the Board of Contract Appeals is an "independent unit of the Executive Branch of the State government," created by the General Procurement Law to resolve disputes with respect to State procurement contracts. S.F.P. §§ 15-205 to 15-206. The Board's jurisdiction is set forth in S.F.P. § 15-211:
§ 15-211. Jurisdiction; finality of decisions.
(a) Jurisdiction.  The Appeals Board shall have jurisdiction to hear and decide all appeals arising from the final action of a unit:
(1) on a protest relating to the formation of a procurement contract; or
(2) except for a contract claim relating to a lease of real property, on a contract claim by a contractor or a unit concerning:
(i) breach;
(ii) performance;

*1206 (iii) modification; or
(iv) termination.
(b) Finality of decisions.  A decision of the Appeals Board is final, subject to any judicial review.
In response to the law firm's administrative appeal, the Attorney General moved to dismiss, arguing that the Board lacked subject matter jurisdiction because the contingent fee contract was "not a procurement contract" within the scope of the General Procurement Law. Angelos, 364 Md. at 450-51, 773 A.2d 504. The Attorney General claimed, instead, that the contractual arrangement with the firm was governed solely by a separate statute that gave the Attorney General authority to employ "`assistant counsel'" in an "`extraordinary or unforeseen case.'" Id. at 452 & n. 4, 773 A.2d 504 (quoting statute). The Attorney General also filed in circuit court a separate complaint for declaratory and injunctive relief against the firm, seeking to avoid the contingent fee claims on several grounds. Id. at 451, 773 A.2d 504. The firm responded with a counterclaim seeking specific performance of the contract. Id.
In the administrative action, the Board of Contract Appeals determined that the firm "`is an independent contractor whose Contract is covered by the General Procurement Law,'" and denied the Attorney General's motion to dismiss. Id. at 452, 773 A.2d 504 (quoting the Board of Contract Appeals). In the circuit court, the Attorney General sought a writ of certiorari to reverse the interlocutory decision of the Board. Id. at 453, 773 A.2d 504. The circuit court determined, in agreement with the Board, that the contract was a procurement contract. Therefore, it dismissed the declaratory action and denied the writ. Id.
Thereafter, the Court of Appeals held that the circuit court did not have authority to review an interlocutory jurisdictional decision of the Board of Contract Appeals, id. at 456, 773 A.2d 504, and should not have reached the issue of whether the contract was a procurement contract. Id. at 458, 773 A.2d 504. In the Court's view, the parties were not "entitled to a judicial decision concerning the nature of the contract prior to a final decision by the Board of Contract Appeals." Id. at 457, 773 A.2d 504. It reasoned: "Where an administrative agency has primary or exclusive jurisdiction over a controversy, the parties . . . must ordinarily await a final administrative decision before resorting to the courts for resolution of the controversy." Id.
Notably, the Court rejected the Attorney General's claim that, "where the administrative agency has no jurisdiction over a controversy, the parties need not wait for a final administrative decision but are entitled to an immediate judicial resolution of the matter." Id. It recognized that, "[i]n situations where a controversy or matter is pending before an adjudicatory administrative agency, we have assumed, without deciding, that a party need not await a final administrative decision where the administrative `agency is palpably without jurisdiction.'" Id. at 457-58, 773 A.2d 504 (citation omitted) (internal quotation marks omitted). Nevertheless, the Court posited that the case before it was not such a situation, stating:
Regardless of how the "procurement contract" issue is ultimately resolved, it is obvious that the Board of Contract Appeals is not "palpably without jurisdiction." The contract at issue is a government contract for the procurement of legal services to be rendered to the State of Maryland. It was submitted by the Attorney General to the Board of Public Works for approval by that Board. While it may or may not technically be a "procurement contract" within the meaning of the state procurement law, the issue is obviously a reasonably debatable one. As the agency charged *1207 with making final administrative adjudications under the procurement law, the Board of Contract Appeals' determination of the issue, embodied in a final decision by the Board, would be helpful prior to a judicial resolution of the issue. This is clearly not a situation where the Board of Contract Appeals is "palpably without jurisdiction."
Id. at 458, 773 A.2d 504 (citation omitted). Accordingly, the Court determined that the circuit court should have denied the writ of certiorari, id. at 456, 773 A.2d 504, and should have stayed the declaratory action, pending the outcome of the administrative proceeding. Id. at 458, 773 A.2d 504.
We glean from Angelos that the question of whether a contract with a State agency is a "procurement contract," within the purview of the General Procurement Law, is jurisdictional. Angelos teaches that, ordinarily, the question of whether a particular contract is a "procurement contract" should be resolved, in the first instance, by the Board of Contract Appeals. However, the parties need not seek initial resolution from the Board if the Board is "palpably without jurisdiction." Id. at 458, 773 A.2d 504.
Writing for the Court in Heery International, Inc. v. Montgomery County, 384 Md. 129, 862 A.2d 976 (2004), Judge Harrell elucidated the meaning of the "palpably without jurisdiction" exception to the requirement of administrative exhaustion, from which we derive the following guideposts. Id. at 138-145 & nn. 6-7, 862 A.2d 976. First, the "palpably without jurisdiction" standard is an exception, applicable in "extraordinary circumstances," id. at 140, 862 A.2d 976, to the principle that "particular issues of statutory interpretation should be decided in the first instance by the administrative agency charged with interpreting the particular statute." Id. at 143, 862 A.2d 976.[38]
Second, "in order to invoke the `palpably without jurisdiction' standard, the agency's actions must concern the agency's `fundamental jurisdiction.'" Id. (citation omitted). In other words, the party invoking the standard must "challenge[] the underlying fundamental subject matter jurisdiction of the agency," id., and must "demonstrate that [the] agency is operating indisputably beyond its authority, and distinctly outside its fundamental jurisdiction," rather than merely misinterpreting or misapplying the applicable substantive or procedural law. Id. at 145, 862 A.2d 976.
Third, although Maryland cases "confirm" the standard's "availability in the appropriate case," id. at 141-42 & n. 7, 862 A.2d 976, there are few examples in the case law of an agency acting "palpably without jurisdiction" or "palpably without authority." When Heery was decided, no Maryland case had held that an agency was "palpably without jurisdiction" to adjudicate a particular case. Id.[39]
*1208 As noted, the Board of Contract Appeals is not "palpably without jurisdiction" over a "contract for the procurement of. . . services to be rendered to the State," even if that contract may not technically be a "procurement contract." Angelos, 364 Md. at 458, 773 A.2d 504. Angelos also teaches that courts should defer to an agency to make its own jurisdictional determination in the first instance, if the question on which jurisdiction turns is "reasonably debatable." Id. We are also guided by other examples from the case law, which illustrate when an agency is not "palpably without jurisdiction." See, e.g., Freedom Express/Domegold, supra, 375 Md. at 20, 825 A.2d 354 (Human Relations Commission was not palpably without jurisdiction to determine whether business met number-of-employees threshold test to qualify as an "employer" subject to the Commission's enforcement power); Bd. of License Comm'rs v. Corridor Wine, Inc., 361 Md. 403, 417-19, 761 A.2d 916 (2000) (liquor board was not palpably without jurisdiction to determine whether licensee's probation before judgment qualified under applicable statute as a bar to further proceedings before board); Montgomery County v. Ward, 331 Md. 521, 524-28, 629 A.2d 619 (1993) (Workers' Compensation Commission was not palpably without jurisdiction over workers' compensation case, despite party's contention that Commission violated applicable procedural regulations by entertaining a "second motion for rehearing," which regulations allegedly did not authorize); Md. Comm'n on Human Relations v. MTA, 294 Md. 225, 235, 449 A.2d 385 (1982) (Commission on Human Relations, which had jurisdiction over employment discrimination complaints based on "`physical or mental handicap,'" was not palpably without jurisdiction in discrimination claim to determine whether obesity qualified as a handicap).
In this case, however, whether the Agreement was a procurement contract is not "reasonably debatable." As we see it, there is no merit to the MdTA's argument that the Agreement was a procurement contractwhether to procure vehicles or services. To be sure, the Agreement contemplates that vehicles would be procured, but that does not mean that the Agreement itself was a procurement contract. Cf. Coastal Corp. v. United States, 713 F.2d 728, 730 (Fed.Cir.1983) (under federal law, procurement contracts do not include "other contracts tangentially connected with government procurement of goods and services"). The Agreement is not a procurement contract for vehicles, because it is not an agreement between the MdTA and the supplier of the vehicles to the agency.
We regard as instructive the common-sense observation of the United States Court of Appeals for the Federal Circuit, noting that the hallmark of a government procurement contract is a "buyer-seller relationship." G.E. Boggs & Assocs. v. Roskens, 969 F.2d 1023, 1027 (Fed.Cir. 1992); see also Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1344 *1209 (Fed.Cir.2008) (agreement was not a procurement contract where agreement "did not provide for transfer of goods or services to the government, there was no evidence of a buyer-seller relationship, and the government did not receive a direct benefit"); Institut Pasteur v. United States, 814 F.2d 624, 627 (Fed.Cir.1987) (governmental procurement contracts are typified by "a buyer-seller relationship and an expenditure of government funds").[40] The observation finds support in the General Procurement Law, one purpose of which is "getting the maximum benefit from the purchasing power of the State." S.F.P. § 11-201(a)(7).
We also disagree with the MdTA that the Agreement was "a contract to procure the Lodge's services in defeating pending collective bargaining legislation." In its memorandum to the circuit court, the MdTA characterized the Agreement as "a private lobbying contract through which the Authority could use . . . more than $12 million of public funds[] to seek to influence the General Assembly." We agree with the Lodge that "[t]he MdTA's assertion that the Agreement proposed that the MdTA spend $12 million to hire lobbyists is absurd." The PPV program was not an elaborate means of compensating the Lodge for advocating the agency's position to the Legislature.[41]
The Agreement is unlike the contract at issue in Angelos, where, as the Court of Appeals noted, "[w]hile it may or may not technically be a `procurement contract' within the meaning of the state procurement law," the contingent fee contract was "a government contract for the procurement of legal services to be rendered to the State of Maryland." Angelos, 364 Md. at 458, 773 A.2d 504. In Angelos, there was clearly a buyer-seller relationship. In contrast, the Agreement did not create a buyer-seller relationship with a State agency.
Accordingly, we conclude that the Board of Contract Appeals is palpably without jurisdiction over this matter. Our conclusion resolves the jurisdiction issue as well as the merits of the MdTA's contentions on this point. Because the Agreement is not a procurement contract, it is not subject to the General Procurement Law, nor is it an ultra vires hiring of lobbyists, beyond the scope of the agency's enumerated powers.

3. Collective Bargaining
The Authority maintains that "[a]n agreement between a state government agency and its employees on a collective basis to establish employee working conditions" is "a collective bargaining agreement." In support of its motion to dismiss, the MdTA contended below that, because the Agreement called for the creation of a take-home vehicle program, it was an agreement between the MdTA and its employees regarding the "terms and conditions of employment." It asserted: "Where a union seeks to enforce an agreement with a state government employer concerning terms and conditions of employment, that agreement, if it is any agreement at all, is a collective bargaining *1210 agreement, and it may not be enforced absent fulfillment of the statutory preconditions" prescribed in the State Personnel and Pensions ("S.P.P.") Article of the Maryland Code (2009 Repl.Vol.), governing collective bargaining for State employees.
On appeal, the MdTA observes that "[t]he Lodge and the Authority Police officers self-evidently did not have the right to bargain collectively, which is why they initially pursued legislation to obtain that right." It insists that collective bargaining agreements "must fulfill numerous statutory conditions to be enforceable, and the purported agreement between the Authority and the Lodge fulfills none of them." Claiming that the "preconditions to collective bargaining" were not met, appellees maintain that the Agreement is "unenforceable as against public policy."
The preconditions, discussed infra, were not satisfied, nor could they have been, because at the time MdTAP officers were not included in the program of collective bargaining authorized in the S.P.P. Article. In its memorandum to the circuit court, the Authority remarked: "It is an irony of this case . . . that the very legislation that the FOP purportedly defeated pursuant to the `agreement' would have removed one of the legal obstacles to the enforcement of the `agreement' by providing for collective bargaining rights for MdTA police officers."
That irony was not lost on appellants, who contended in their opposition, and reiterated in their appellate brief, that "[t]he FOP currently does not have the right to bargain collectively, and the Agreement is not a collective bargaining agreement."[42] Accusing appellees of "recharacterizing a simple contractual agreement as a `collective bargaining' agreement," they assert: "Nothing in the statute or case law excludes the ability to enter into a simple contract absent the availability of collective bargaining. The MdTA is assuming that collective bargaining is the sole manner in which to contract."
The first precondition to State employee collective bargaining cited by appellees is that "the employees at issue must have the right to bargain collectively." For this proposition, the MdTA relies on McCulloch v. Glendening, 347 Md. 272, 701 A.2d 99 (1997), and Office & Professional Employees International Union, Local 2 v. MTA, 295 Md. 88, 453 A.2d 1191 (1982). The remaining preconditions enumerated by the Authority are drawn from the S.P.P. Article:
Second, the employees must have elected an exclusive representative of their bargaining unit. See [S.P.P.] §§ 3-401 to 3-407. Third, the State Labor Relations Board must have certified the representative's election. [S.P.P.] § 3-406. Fourth, any agreement must have been reduced to a memorandum of understanding signed by the Governor of Maryland or a person the Governor designates to sign on his or her behalf. [S.P.P.] § 3-601(a)(2)(i). Finally, the agreement must be ratified by a majority of votes cast by employees in the bargaining unit. [S.P.P.] § 3-601(c).
In our view, the Agreement was not subject to the requirements related to collective bargaining agreements. Therefore, the Authority's claim fails on this basis.
In explaining our conclusion, we first review the Court's jurisprudence on the subject of public employee collective bargaining, including McCulloch, 347 Md. 272, 701 A.2d 99, which is the principal case upon which the MdTA relies. McCulloch is part of an extensive line of authority *1211 that originates with Mugford v. Mayor of Baltimore, 185 Md. 266, 44 A.2d 745 (1945).
In Mugford, taxpayer plaintiffs sued the City of Baltimore Department of Public Works and a union. Id. at 268, 44 A.2d 745. The plaintiffs sought to void an agreement between the City and the union that recognized the union "as the collective bargaining agency for its members, consisting of street-cleaners and other employees of the City." Id. at 270, 44 A.2d 745. The plaintiffs successfully obtained an order declaring the agreement invalid, but they challenged on appeal a portion of the order that declined to forbid a scheme whereby employee members of the union could have their union dues deducted directly from their paychecks and remitted to the union "`upon a purely voluntary basis, terminable by any employee at any time.'" Id. at 269, 44 A.2d 745 (emphasis omitted).
Before considering the plaintiffs' contentions (and ultimately affirming the circuit court, see id. at 272-73, 44 A.2d 745), the Court observed that "the ruling . . . that the agreement is invalid cannot be reviewed on this appeal," because the City and the union had not challenged it. Id. at 269-70, 44 A.2d 745. Nevertheless, the Court observed, in dicta, that the circuit court's invalidation of the agreement was well founded, because the City Charter did not authorize such an agreement. The Court said, id. at 270-71, 44 A.2d 745:
[T]he Department of Public Works could not bind the City, by contract, in any particular relative to hours, wages or working conditions, either as to union employees, or as to all employees in the same classification. To the extent that these matters are covered by the provisions of the City Charter, creating a budgetary system and a civil service, those provisions of law are controlling. To the extent that they are left to the discretion of any City department or agency, the City authorities cannot delegate or abdicate their continuing discretion. Any exercise of such discretion by the establishment of hours, wages or working conditions is at all times subject to change or revocation in the exercise of the same discretion. . . .
* * *
The City has no right under the law to delegate its governing power to any agency. The power of the City is prescribed in its charter, and the City Charter constitutes the measure of power that is possessed by any of its officials. To delegate such power to an independent agency would be a serious violation of the law. To recognize such delegation of power in any City department might lead to the delegation of such power in all departments, and would result in the City government being administered regardless of its charter.
The Court recognized, however, that the City had a general policy of permitting employees to request payroll deductions for various items, such as "pensions and charitable funds." Id. at 272, 44 A.2d 745. Accordingly, it concluded that "the City may, consistently with its general policy extend to individual employees the privilege of having dues deducted and paid to this or any other Union, upon request of the individual employee." Id.
Some thirty-two years later, in Maryland Classified Employees Ass'n v. Anderson, 281 Md. 496, 380 A.2d 1032 (1977), the Court addressed the topic of public employee collective bargaining. Like Mugford, Anderson did not involve employees of a State agency. Rather, it concerned the bargaining rights of employees of Harford County. The County had enacted an ordinance declaring the public policy of the County to be "`that County *1212 employees be permitted to participate effectively in the determination of the terms and conditions of their employment,'" and prescribing procedures for collective bargaining. Id. at 507, 380 A.2d 1032 (quoting County Code). The procedure at issue required that, where the employees and the County reached an impasse regarding any particular issue, that issue would be submitted to "`binding arbitration.'" Id. (quoting County Code).
Pursuant to the County ordinance, the Maryland Classified Employees Association was certified as the employees' exclusive bargaining representative, and entered into negotiations with the County regarding employee compensation. Id. at 498, 380 A.2d 1032. Negotiations reached an impasse, and the matter was submitted to arbitration. Id. The arbitration panel issued an award calling for a 7.8% raise in the next fiscal year and subsequent annual step increases. Id. Although the County Code "prescribed that the decision of the arbitration board be binding on both parties, the County did not put the award into effect." Id. Rejecting the plan provided in the arbitration award, the County Council instead enacted a more modest set of one-time raises, with no provision for step increases. Id.
The Association and individual employees sued to enforce the arbitration award, and the County defended on the basis that its own ordinance providing for binding arbitration was invalid. Id. at 499, 380 A.2d 1032. The Court of Appeals agreed with the County, observing: "Although local governments are normally bound by their contracts, it has long been recognized that questions of invalidity and enforceability arise when governmental bodies attempt by ordinance or contract to surrender or bargain away their discretionary legislative functions." Id. at 508, 380 A.2d 1032 (citation omitted). Citing several decisions of foreign jurisdictions, the Court synthesized the case law as follows:
Where municipal governments have been authorized by higher law, i.e., state constitutional provisions or public general laws or municipal charter provisions, to enter into collective bargaining agreements which bind them in the exercise of their legislative discretion, the courts have generally upheld such collective bargaining agreements, rejecting contentions that they amount to invalid abdications or delegations of legislative authority. On the other hand, in the situation where neither a public general law nor municipal charter provision authorized the municipality to bind itself in the exercise of legislative discretion over public employee compensation, the courts have generally taken the position that attempts to do so in collective bargaining agreements or municipal ordinances are invalid.
Id. at 508-509, 380 A.2d 1032 (footnotes omitted). Relying on Mugford, the Court remarked: "More than thirty years ago our predecessors gave clear indication of fundamental accord with this position. . . . This Court has not thereafter expressed a contrary view." Id. at 509-11, 380 A.2d 1032.
According to the Court, "[t]he County ordinance in question plainly attempted to bind the County in the exercise of legislative discretion over compensation of its public employees." Id. at 511, 380 A.2d 1032. The Court assumed, without deciding, that "had a State public general law or the County Charter authorized the binding arbitration provisions enacted by the County Council, the provisions would be valid." Id. at 512, 380 A.2d 1032. "But," the Court determined, "there is no such authority in either a public general law or the County Charter." Id. Reviewing the applicable provisions of the Harford County *1213 Charter, the Court recognized that the Charter stated that "`[a]ll legislative powers. . . shall be vested in the Council,'" and that the County Council had "`no power to create standing committees or to delegate any of its functions or duties to a smaller number of its members than the whole.'" Id. at 511-12, 380 A.2d 1032 (quoting County Charter). Moreover, the Charter vested complete control of the County budget in the Council, see id. at 512, 380 A.2d 1032, and provided that salaries and wages of employees required council approval after being "determined in accordance with established classification and salary plans," which must be adopted by county law. Id. Therefore, the Court concluded: "Because the Harford County ordinance attempted to bind the County in the exercise of its legislative discretion over public employee compensation without being authorized to do so by a public general law or by the County Charter, the provisions of the ordinance to that end are invalid." Id. at 513, 380 A.2d 1032.
Anderson was followed by Office & Professional Employees Int'l Union, Local 2 v. MTA, supra, 295 Md. 88, 453 A.2d 1191, in which the Court considered the authority of the State transit agency to enter into a collective bargaining agreement with a union representing a particular group of MTA employees. The MTA was authorized by State law to engage in collective bargaining with the designated representatives of certain classes of employees, but the statute did not explicitly include the group of employees at issue. Id. at 95, 453 A.2d 1191. The union asserted that because the statute did not affirmatively prohibit the MTA from entering into collective bargaining with the subject employees, the transit agency was "free to do so by agreement." Id. at 96, 453 A.2d 1191. The Court rejected the claim.
Principally, the Court rested its conclusion on the canon of statutory construction, "expressio unius est exclusio alterius," i.e., "the Legislature's enumeration of one item, purpose, etc. ordinarily implies the exclusion of all others." Id. at 96, 453 A.2d 1191. But, the Court reasoned that, even if it did not construe the statutory text to implicitly ban collective bargaining, the union's claim "would still lack merit." Id. at 97, 453 A.2d 1191. The Court explained:
It is established in this State that, absent express legislative authority, a government agency cannot enter into binding arbitration or binding collective bargaining agreements establishing wages, hours, pension rights, or working conditions for public employees. . . . [T]he MTA is an agency of the state government. Therefore, the mere absence of a prohibition against a collective bargaining agreement concerning the wages, working conditions, etc., of the additional clerical employees would not aid the Union's cause. Instead, under the Anderson and Mugford cases, the MTA may enter into only those collective bargaining agreements which are expressly authorized by statute.
Id. (internal citations omitted).
Montgomery County Education Ass'n v. Board of Education of Montgomery County, 311 Md. 303, 534 A.2d 980 (1987) ("MCEA"), provides further guidance. In that case, a State statute authorized collective bargaining concerning "`salaries, wages, hours, and other working conditions,'" for public school systems and their employees. Id. at 305, 534 A.2d 980 (quoting statute). The question presented by the case was whether "the employees' designated representatives may require a public school employer to negotiate, and thus possibly to arbitrate, the issues of the school calendar and job reclassification." *1214 Id. The Court reiterated that, "absent express legislative authority, a government agency may not enter into binding arbitration agreements under which an arbitrator establishes the wages, hours, etc., for public employees." Id. at 313, 534 A.2d 980. "The purpose of this rule," explained the Court, "is to insure that a governmental agency does not, without authority, abdicate or bargain away its statutory discretion." Id.
MCEA recognized that, in the case before it, there was statutory authorization for collective bargaining over working conditions of school employees. See id. But, in construing the statutory provisions, the Court determined that it was
clear that a local [school] board's duty to engage in collective bargaining "does not supercede" its statutory authority to determine and implement educational policy. . . . Rather, [the statute] suggests a dichotomy between "matters that relate to salaries, wages, hours, and other working conditions," which are negotiable, and matters of educational policy, which are not.
Id. at 315, 534 A.2d 980. Further, the Court explained, id. at 317, 534 A.2d 980 (citation omitted):
Local [school] boards are state agencies, and, as such, are responsible to other appropriate state officials and to the public at large. Unlike private sector employers, local boards must respond to the community's needs. Public school employees are but one of many groups in the community attempting to shape educational policy by exerting influence on local boards. To the extent that school employees can force boards to submit matters of educational policy to an arbitrator, the employees can distort the democratic process by increasing their influence at the expense of these other groups.
Accordingly, the Court endorsed a "balancing test" formulated by the State Board of Education to determine whether a particular matter was related to "`working conditions'" or was, instead, a matter of "educational policy." Id. at 316, 534 A.2d 980. The Court upheld the Board's application of its test and its conclusion that the school calendar and employee reclassification were matters of policy that were "non-negotiable." Id. at 318-23, 534 A.2d 980.
In Anne Arundel County v. Fraternal Order of Anne Arundel Detention Officers and Personnel, 313 Md. 98, 543 A.2d 841 (1988) ("Detention Officers"), however, the Court cautioned against an overbroad "misreading" of its earlier opinions on the subject of public employee collective bargaining. Id. at 111, 543 A.2d 841. In that case, the County and the union representing its detention officers disputed whether officers in a newly-established position of lieutenant would be eligible for representation by the union. Id. at 101, 543 A.2d 841. A County ordinance authorized collective bargaining for County employees, as well as arbitration to resolve disputes as to "`the determination of the appropriate representation unit'" for an employee or class of employees. Id. at 101, 543 A.2d 841 (quoting ordinance). The collective bargaining agreement between the detention center employees' union and the County provided that whether a newly-created position would be "included in the unit represented by the Union depends upon `the mutual agreement of the County and the Union,'" and called for arbitration of any disagreement pursuant to the County Code. Id. at 101, 543 A.2d 841 (quoting agreement). Although the union sought to include the lieutenants in its bargaining unit, the County refused to arbitrate the dispute. As a result, the union sued to compel arbitration. Id. at 101-02, 543 A.2d 841.
*1215 The County contended that its ordinance calling for "arbitration of a public employee labor dispute . . . [was] invalid unless authorized by the Anne Arundel County Charter or by the General Assembly." Id. at 110, 543 A.2d 841. But, the Court rejected the County's "broad contention, that any arbitration pursuant to a local ordinance and collective bargaining agreement is invalid unless specifically authorized by the county charter or public general law." Id. at 111, 543 A.2d 841 (emphasis in original).
In reviewing its earlier cases, the Court noted that the MTA case involved State employees, not local ones, and observed that in MTA there was a statutory authorization for collective bargaining that excluded the class of employees at issue. Therefore, the Court determined that "the MTA case clearly does not support" the County's position in Detention Officers, which involved local employees and a local ordinance that gave "express legislative authority" for collective bargaining with the subject employees and arbitration of the type of dispute at issue. Id. at 111-15, 543 A.2d 841. The Court said, id. at 113, 543 A.2d 841: "Nothing in the MTA case suggests. . . that the legal authorization for a local government agency to engage in collective bargaining and arbitration could not come from a local ordinance." The Court elaborated:
It is true that the Anderson and Mugford cases . . . did concern the need for a certain level of legal authorization (i.e. in the charter or public general law) if a local collective bargaining ordinance purported to bind the local government executive and council in the exercise of certain powers or functions which the charter vests in the executive and council. Nevertheless, these earlier cases did not hold that every local government collective bargaining agreement and arbitration must be specifically authorized by charter or public general law. And [Anderson and Mugford] were cited in the MTA opinion only for the more general principle that a collective bargaining agreement with an arbitration provision, entered into by a government agency, must be expressly authorized by law.
Id. at 113-14, 543 A.2d 841 (italics in original; boldface added).
According to the Court, Anderson and Mugford stood for the proposition "that delegation to private individuals, of certain duties involving the exercise of discretion specifically assigned by a county charter to the county executive and council, may be invalid." Id. at 115, 543 A.2d 841. The Court noted that the Anne Arundel County Charter provided for "a detailed executive budget system," whereby the County Executive must submit to the County Council an annual budget "which includes proposed expenditures for employee compensation," and must also "promulgate, subject to County Council approval, a detailed pay plan for county employees which shall classify employees and prescribe a salary range for each class of employees." Id. at 115, 543 A.2d 841.
The County argued that "an arbitrator's decision in the representation dispute will have a substantial impact upon . . . employee compensation," because the collective bargaining agreement contained provisions for specific wage increases and overtime payments, which the County asserted would automatically apply to the lieutenants if they became part of the union's bargaining unit. Id. at 115-16, 543 A.2d 841. "Therefore," the County contended, "the agreement to arbitrate the representation dispute constitutes an invalid delegation of the Executive's and Council's authority over the budget and, specifically, over employee compensation." Id.
*1216 The Court disagreed with the County's assertion that it was free to refuse to arbitrate the dispute over classification of the lieutenants. It explained:
This type of employee classification does not have the direct impact upon the Executive's and Council's duty to set employee compensation that actual determination of the wages and salary of county employees does.
An arbitrator's decision as to which representation unit is appropriate for a certain group of employees may have no effect upon the wages and salaries of those employees; it merely permits the Union to bargain with the County on behalf of the employees. Furthermore. . . the County Council and the County Executive still retain the ultimate decision-making authority with respect to employee compensation. Both the County Executive and the County Council must, in accordance with their duties under the Charter, approve any agreement reached [with] Union representatives.
Id. at 116-17, 543 A.2d 841 (citations omitted).
Freeman v. Local 1802, AFSCME Council 67, 318 Md. 684, 569 A.2d 1244 (1990), is also noteworthy. In that case, the County Executive of Harford County, pursuant to a County ordinance authorizing collective bargaining, began negotiations with labor unions representing different groups of county employees. Id. at 686, 569 A.2d 1244. During the negotiations, the County Executive received a legal opinion concluding that he had no authority to bargain collectively with the unions, due to the lack of a State law or county charter provision explicitly authorizing the county collective bargaining ordinance. Id. The County Executive did not disclose the opinion until a tentative agreement had been reached with the unions, ratified by their membership, and submitted for his signature. Id. at 687-88, 569 A.2d 1244. He then informed the unions that he would not sign the agreements, prompting the unions to sue for a writ of mandamus to compel him to do so. Id. at 688, 569 A.2d 1244. After the circuit court granted the writ, the County appealed. Id.
During the pendency of the appeal, the Court of Appeals decided Detention Officers. Id. at 690, 569 A.2d 1244. On the basis of that decision, the Freeman Court rejected the County's arguments, founded on its reading of Mugford, Anderson, MTA, and MCEA, that the County ordinance authorizing collective bargaining was invalid due to the lack of explicit authorization in a State law or County charter provision. Id. at 690-91, 569 A.2d 1244. Rather, the Court cited Detention Officers for the proposition that a local ordinance cannot "delegat[e] to others . . . `duties involving the exercise of discretion specifically assigned by a county charter to the county executive and council.'" Id. at 691, 569 A.2d 1244 (quoting Detention Officers, 313 Md. at 115, 543 A.2d 841) (emphasis added). Synthesizing the holdings of Detention Officers and its prior cases, the Freeman Court said, 318 Md. at 691, 569 A.2d 1244: "In other words, simply put, a local collective bargaining ordinance [may] not violate the county charter, unless the General Assembly of Maryland by public general law in effect abrogated the inconsistent provision of the charter." (Emphasis added). The Court determined that "it was clearly permissible for Harford County, by a duly enacted ordinance, to authorize collective bargaining with county employees." Id.
Nevertheless, the Freeman Court ruled in the County's favor. Id. at 697, 569 A.2d 1244. As the Court explained, "mandamus ordinarily will not lie to control the exercise of discretion." Id. at 692, 569 A.2d 1244. Under the County's collective bargaining *1217 law, the Court observed, "the County Executive has the discretion to agree to terms with the labor organizations, or not to agree to terms." Id. at 695, 569 A.2d 1244. In the Court's view, "even assuming that the County Executive had orally accepted all terms of the agreements, mandamus would still not lie to compel his signature." Id. at 694, 569 A.2d 1244. The Court concluded, id. at 697, 569 A.2d 1244:
Mandamus cannot be based on a court's conclusion that the decision-making official with regard to a contract, who has refused to sign the document, has really agreed to it. The moment where the County Executive's discretion . . . has come to an end is the moment when he affixes his signature to an agreement. The trial court in this case erred in issuing a writ of mandamus prior to that moment.
In Fraternal Order of Police, Inc., Baltimore County, Lodge No. 4 v. Baltimore County, 340 Md. 157, 166, 665 A.2d 1029 (1995), the Court again corrected any "misreading" of its earlier opinions. There, Baltimore County entered into a collective bargaining agreement with its police officers' union, effective for fiscal year 1992, pursuant to a County ordinance authorizing collective bargaining. Id. at 160, 665 A.2d 1029. The collective bargaining agreement required the resolution of grievances by binding arbitration. Id. It also "contained a provision that prohibited `reduction[s] in force required by lay off or furlough during fiscal year 1992.' The County agreed to this provision in return for the Union's agreement to a freeze on cost-of-living adjustments for fiscal year 1992." Id. at 160-61, 665 A.2d 1029 (quoting agreement; alteration in original; footnote omitted). After the agreement was signed, the County Executive submitted, and the County Council approved, a budget for fiscal year 1992, which contained "appropriations for the full wages and benefits of the police officers as provided for in the collective bargaining agreement." Id. at 161, 665 A.2d 1029. But, midway through the fiscal year, "despite the [agreement's] prohibition on furloughs, the County, facing a revenue shortfall for 1992, enacted a plan to furlough for five days all county employees, including the police officers." Id. The union challenged the furlough decision through arbitration; the arbitrator ruled that the agreement prohibited the County from furloughing the officers. Id. at 161-62, 665 A.2d 1029. The County then filed suit to vacate the arbitration award, contending that "the determination of whether to impose furloughs . . . because it affects the compensation to be received by employees[,] . . . [was] within the exclusive domain of the County and could not be arbitrated." Id. at 162, 665 A.2d 1029.
The Court of Appeals rejected the County's reliance on Anderson and Detention Officers. It observed that the county code provisions at issue called for the passage of an annual budget, and directed that collective bargaining agreements "`with respect to wages, hours, [and] terms and conditions of employment'" must be "duly negotiated prior to the submission of the budget to the County Council." Id. at 165-66, 665 A.2d 1029 (quoting county ordinance). Although the Court recognized that, unlike Detention Officers, the case at hand involved arbitration that directly affected compensation, id. at 170, 665 A.2d 1029, it determined that arbitration was proper, because the arbitrator's decision did not "remove[] from the County Executive and County Council their legislative discretion with regard to appropriations." Id. at 167, 665 A.2d 1029. In Fraternal Order, the County Executive and County Council had exercised their discretion and enacted a budget "appropriat[ing] the funds necessary for the full personnel expenditures covered by the collective bargaining *1218 agreement." Id. at 168, 665 A.2d 1029. The Court explained: "Instead of the arbitrator attempting to bind the County Executive and the County Council in the performance of their budgetary functions . . ., as in the Anderson case, the arbitrator's decision in the present case reflected an implementation of the Executive's and Council's budget decision. . . ." Id.[43]
Finally, we arrive at McCulloch v. Glendening, supra, 347 Md. 272, 701 A.2d 99, the case on which the MdTA stakes its claim. In McCulloch, taxpayer plaintiffs challenged the constitutionality of an executive order of Governor Parris Glendening, which established a program of collective bargaining for employees of the principal departments of the Executive Branch and certain other State agencies. Id. at 275-77, 701 A.2d 99. Although no statute authorized the Governor's collective bargaining program, the Court of Appeals upheld the executive order.
The Court articulated the rule that, "`absent express legislative authority, a government agency cannot enter into binding arbitration or binding collective bargaining agreements establishing wages, hours, pension rights, or working conditions for public employees.'" Id. at 275, 701 A.2d 99 (quoting MTA, 295 Md. at 97, 453 A.2d 1191). But, the Court determined that the rule did not control the situation before it. Citing the prior jurisprudence that we have reviewed, the Court stated: "It is well settled that not all collective bargaining agreements to which the State or a governmental agency is a party require prior express legislative approval. . . ." McCulloch, 347 Md. at 275, 701 A.2d 99. Rather, the Court opined, "it is only those [agreements] that contain a binding arbitration clause or are otherwise binding upon and enforceable against the State." Id. This was because the purpose of the rule is "`to insure that a governmental agency does not, without authority, abdicate or bargain away its statutory discretion.'" Id. at 276, 701 A.2d 99 (quoting MCEA, 311 Md. at 313, 534 A.2d 980).
The executive order at issue in McCulloch authorized employees to choose representatives and to bargain collectively with their employing agencies "`in good faith at reasonable times and places with respect to wages, hours, and other terms and conditions of employment.'" Id. at 276-77 & n. 4, 701 A.2d 99 (quoting executive order). Under the order, such negotiations were to culminate in the execution of "`a written memorandum of understanding incorporating the terms of any agreement reached.'" Id. at 277, 701 A.2d 99 (alterations in original) (quoting executive order). All such agreements were "`subject to the approval of the Governor.'" Id. at 279, 701 A.2d 99 (quoting executive order). Moreover, the order provided that, "`to the extent [any terms of the agreement] require legislative approval or the appropriation of funds, [those] terms shall be recommended to the Legislature for approval or the appropriation of funds, as may be necessary.'" Id. at 277, 701 A.2d 99 (quoting executive order; alterations in original).
The McCulloch plaintiffs contended that the executive order violated the separation of powers, because the "subject of the Executive Order," i.e., wages and working conditions, "is one resting solely and exclusively within the purview of the legislative branch," and there was no "`express legislative authority'" for the executive order. Id. at 282-84, 701 A.2d 99 (quoting plaintiffs). Rejecting this view, the Court observed that the Governor enjoys "a significant role in setting policies to govern the *1219 management and supervision of State employees," id. at 284, 701 A.2d 99, including "the power to establish personnel policies and to require executive agency heads to carry out those policies." Id. at 284-85, 701 A.2d 99.
Moreover, in the Court's determination, the executive order did not, "`without authority, abdicate, or bargain away [the Governor's] statutory discretion.'" Id. at 292, 701 A.2d 99 (quoting MCEA, 311 Md. at 313, 534 A.2d 980; alteration in original). The Court explained that, unlike the agreements in Anderson and MCEA, the order did not "provide for binding arbitration or any other form of binding dispute resolution mechanism." Id. at 293, 701 A.2d 99. Further, the Court observed: "[A]ny agreement that may be reached is still `subject to the approval of the Governor.' And, as the circuit court opined, `a State employee union would be afforded no legal recourse if the governor failed to approve an agreement.'" Id. at 294, 701 A.2d 99 (quoting executive order and circuit court's decision). The Court also said: "Even if the Governor approves an agreement and signs a memorandum of understanding, to the extent that it requires legislative approval or the appropriation of funds, it is still not binding" until and unless the legislative change or appropriation is made by the General Assembly. Id. Thus, the Court held, id.:
Viewed in its entirety, but with particular emphasis on the Governor's completely discretionary power to either approve or refuse to approve an agreement negotiated pursuant to the terms of the Executive Order, it follows that the Governor, by promulgating the Order, has neither abdicated nor bargained away any statutory or gubernatorial authority.
Having reviewed the relevant cases from the Court of Appeals,[44] we turn to apply their teachings to the case at hand.
As indicated, the parties quarrel over whether the Agreement is a "collective *1220 bargaining agreement." To be sure, the Agreement arguably concerns the terms and conditions of employment, as the Authority maintains. But, the Agreement also lacks many hallmarks of collective bargaining agreements. For instance, the Agreement does not recognize the Lodge as the exclusive bargaining representative of the officers; it does not comprehensively resolve all issues of wages, hours, and working conditions (indeed, it concerns only one issue); nor does it provide for arbitration to resolve disputes.
Yet, the resolution of the question before us does not turn on the label that is applied to the Agreement. Therefore, we need not resolve the dispute over nomenclature. Even if the Agreement can be considered a "collective bargaining agreement," the Court of Appeals made clear in McCulloch that "not all collective bargaining agreements to which the State or a governmental agency is a party" are subject to the rule requiring express legislative approval. McCulloch, 347 Md. at 275, 701 A.2d 99. Rather, McCulloch taught that courts must keep in mind "the guiding principle underlying the rule that legislative authority is necessary as a condition precedent to a public agency entering into binding arbitration or a binding collective bargaining agreement-`to insure that a governmental agency does not, without authority, abdicate, or bargain away its statutory discretion.'" Id. at 292, 701 A.2d 99 (quoting MCEA, 311 Md. at 313, 534 A.2d 980). In accord with McCulloch, we must measure the substance of the Agreement against the requirements of the rule; it is not determinative, and therefore not necessary to decide, whether the Agreement is a "collective bargaining agreement" as a mere matter of form. Cf. Walker v. Dept. of Human Res., 379 Md. 407, 421, 842 A.2d 53 (2004) (considering whether statutory provisions concerning "collective bargaining agreements" applied to a "memorandum of understanding," and remarking: "Though perhaps not a collective bargaining agreement . . . the MOU is clearly a contract between the State and [a union], acting as exclusive representative of [state employees] in the bargaining unit.").
In this case, the Agreement did not bargain away the MdTA's statutory discretion, or attempt to delegate to a third party the discretion of the MdTA or any other State body. Indeed, the Agreement does not delegate any decision making power to an arbitrator or any other third party. To that extent, the decisions in Anderson, MCEA, Detention Officers, and Fraternal Order, concerning the validity and applicability of arbitration provisions, are not controlling. On the summary judgment record before us, the only obligation the Agreement placed on the Authority was to fund and implement the PPV program. The Agreement was signed by the Authority's Executive Secretary and was subsequently ratified unanimously by the Authority.[45] The Agreement presents no danger of any party, other than the MdTA itself, controlling the Authority's purse strings.
Nor does the Agreement violate the agency's enabling legislation by purporting to arrogate to the MdTA power that it does not have. See Freeman, supra, 318 Md. at 691, 569 A.2d 1244 ("[A] local collective bargaining ordinance [can] not violate the county charter. . . ."). As we have seen, the agency is empowered to "make any contracts and agreements necessary or incidental to the exercise of its powers and performance of its duties." Transp. *1221 § 4-205(c)(1). The statutory scheme by which the MdTA exists also grants plenary authority to the agency over its own finances. It funds its operations out of the toll revenues that it collects, and those revenues "are not subject to supervision or regulation by any instrumentality, agency, or unit" of State or local government. Transp. § 4-312(c)(1). And, unlike most agencies of State government, the MdTA has the independent authority to "employ and fix the compensation of . . . any . . . employees that it considers necessary to exercise its powers and perform its duties." Transp. § 4-205(d)(1). Like all other expenditures of the agency, compensation of its employees comes from the agency's toll revenues. See Transp. § 4-205(d)(2).
As we indicated, the Court of Appeals reviewed the predecessor scheme in Wyatt v. State Roads Commission, supra, 175 Md. 258, 1 A.2d 619, and upheld the agency's fiscal structure, determining that the agency's funds were not "moneys of the State" subject to control by the Comptroller and Treasurer. The MdTA's budget is merely "reported" to the General Assembly. See Transp. §§ 4-205(d)(1), 4-210; see also 70 Op. Att'y Gen. 229 (1985). Neither the Governor nor the General Assembly exercises ultimate discretion over the agency's operational expenditures or the compensation of its employees. Moreover, when the MdTA entered into the Agreement, it did not incur a debt against the treasury of the State.[46]
*1222 Thus, this case is unlike Mugford, Anderson, MTA, and MCEA, which concerned whether State agencies, political subdivisions, or local departments could bind themselves beyond the authority granted by their governing statutes or charters. Rather, this case is analogous to Fraternal Order, supra, 340 Md. 157, 665 A.2d 1029. There, a governmental body exercised its discretion to bind itself to the financial terms of an agreement with its employees. When the body sought to renege, the Court upheld the submission of the issue to binding arbitration, noting that "the arbitrator determined only that the County had violated the terms of the contract which it had made." Id. at 171, 665 A.2d 1029.
To be sure, there is some dicta in the earlier collective bargaining cases that arguably supports the view that specific legislative authorization is required for government to bind itself at all as to matters of public employee compensation, even where no delegation to a third party or subsidiary agency is involved. See, e.g., Mugford, 185 Md. at 270, 44 A.2d 745 ("City authorities cannot delegate or abdicate their continuing discretion. Any exercise of such discretion by the establishment of hours, wages or working conditions is at all times subject to change or revocation in the exercise of the same discretion."). But, to the extent that this dicta ever had force, it has clearly been superseded by later cases.
In McCulloch, the Court upheld the Governor's unilateral executive order establishing a collective bargaining regime without any prior legislative approval. In doing so, the Court emphasized the Governor's "completely discretionary power to either approve or refuse to approve an agreement negotiated pursuant to the terms of the Executive Order." McCulloch, 347 Md. at 294, 701 A.2d 99. Nowhere did the Court suggest that, once the Governor approved a collective bargaining agreement, and, if necessary, legislative authorization for the agreement's provisions was obtained, the agreement would not be binding on the State. Indeed, in Fraternal Order, the Court ruled that a county was bound by a collective bargaining agreement regarding employee compensation, once the county council and executive had exercised their discretion by passing the budgetary appropriations called for in the agreement. See Fraternal Order, 340 Md. at 170-71, 665 A.2d 1029. And in Freeman, the Court stated that a county executive's "discretion . . . has come to an end [at] the moment when he affixes his signature to an agreement," 318 Md. at 697, 569 A.2d 1244, suggesting that thereafter mandamus might lie to compel the exercise of nondiscretionary duties under such an agreement.
Here, the MdTA, by virtue of its plenary authority over its own budget, occupies the same position as the Governor and General Assembly in McCulloch, or the county executive and council in Fraternal Order and Freeman. As we have seen, the Court of Appeals's case law indicates that, once a governmental agency that possesses the discretionary authority to do so has entered into an agreement with its employees, it is bound by that agreement.[47]
*1223 The State waived its sovereign immunity from contract suits in 1976. See S.G. § 12-201 (codifying 1976 Md. Laws ch. 450). Since that time, it has not been an adequate defense to a contract claim for the State simply to say, "the King has changed his mind." Moreover, the MdTA did not make a promise that it had no power to keep. To the contrary, the Authority has discretion over its budget and the working conditions of its employees. Nor did it delegate its discretion to a third party, as there is no arbitration provision in the Agreement. Rather, the Authority bargained with the Lodge and exercised its discretion to commit itself to fund a program that it now no longer desires to maintain. The principles articulated in McCulloch and its antecedents do not permit the MdTA to avoid the Agreement merely because the agency has buyer's remorse.
For all these reasons, we conclude that the court erred in granting summary judgment as to the contract claim.[48]

E. Promissory Estoppel
We next consider whether the court erred in granting summary judgment as to the second count of the Lodge's complaint, alleging liability based on promissory estoppel. The parties advance the same arguments in their briefs to this Court as they raised below.
The MdTA's banner argument below, which the circuit court evidently accepted, was that "[o]rdinarily, the doctrine of estoppel does not apply against the State. . . ." ARA Health Servs., Inc. v. Dept. of Public Safety & Correctional Servs., 344 Md. 85, 96, 685 A.2d 435 (1996). The Authority also contended that the second count "should be dismissed for all of the reasons that Count I should be dismissed," reasoning that the Agreement's alleged indefiniteness and contravention of public policy should defeat a promissory estoppel claim just as they would defeat a claim for breach of contract. Moreover, the MdTA contended that the "individual plaintiffs have not alleged facts to support the elements" of a promissory estoppel claim.
The Authority quoted the elements of promissory estoppel, formulated in the touchstone case of Pavel Enterprises v. A.S. Johnson Co., 342 Md. 143, 166, 674 A.2d 521 (1996):[49]

*1224 1. a clear and definite promise;
2. where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee;
3. which does induce actual and reasonable action or forbearance by the promisee; and
4. causes a detriment which can only be avoided by the enforcement of the promise.
According to the Authority, the allegations of the individual police officers failed to satisfy the first and third elements of the doctrine. Specifically, appellees argued that "the individual plaintiffs have not alleged the existence of a `clear and definite promise,' because they do not allege that they were promised a particular vehicle, nor do they allege that they were promised a vehicle for any specific duration of time." Moreover, as to the third element, the MdTA insisted that "the plaintiffs have not alleged facts to support the element of `reasonable reliance.'" In this regard, the agency rejected the plaintiffs' alleged reliance on statements on the MdTAP website listing "take home cars" as an employment benefit, and similar alleged statements by Chief McLhinney at the police academy orientation, claiming any reliance was unreasonable "[a]s a matter of law."
In support of its position, the MdTA relied upon Maryland Classified Employees Ass'n v. Schaefer, 325 Md. 19, 599 A.2d 91 (1991) (rejecting "implied contract" theory in challenge to governor's decision to increase the hours of the executive branch work week), cert. denied, 502 U.S. 1090, 112 S.Ct. 1160, 117 L.Ed.2d 407 (1992), which it described as standing for the proposition that there is no breach of a promise to State employees when the State changes the conditions of their employment. As the MdTA sees it, "[t]here is no law that prevents a police department with a formal policy of allowing its officers to `take home' their vehicles from withdrawing that policy altogether."
In response, the Lodge sought to distinguish ARA Health Services, contending that the Court in that case "focused on the doctrine of estoppel particularly not applying to cases where it is sought against State correctional services, while this case does not present a similar situation." The Lodge also asserted below: "A statement by the Police Chief as well as a list of benefits provided by an official website are more than authoritative sources for an officer to rely on." In its view, "the authoritative nature of the sources of information support[s] the element of `reasonable reliance.'"
As we shall explain, we agree with appellees that this case is subject to the general rule that estoppel cannot be asserted against the State. Therefore, we need not reach the parties' arguments regarding whether the elements of a promissory estoppel claim were satisfied, and shall affirm the judgment in favor of the MdTA on Count II of the Lodge's complaint.
First, we must clearly stake out the doctrinal terrain on which the parties battle. The ARA Health Services case, on which the Authority relies, and the larger line of cases of which it is a part, do not concern the doctrine of promissory estoppel. Rather, as we shall discuss, infra, they concern the related doctrine of equitable estoppel. The Court of Appeals has distilled the essence of equitable estoppel in many cases. One of the most recent is Maryland Reclamation Associates v. Harford County, 414 Md. 1, 994 A.2d 842 *1225 (2010), in which the Court provided the following definition:
"Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse and who on his part acquires some corresponding right, either of property, of contract, or of remedy."
Id. at 52, 994 A.2d 842 (quoting Hill v. Cross Country Settlements, LLC, 402 Md. 281, 309, 936 A.2d 343 (2007)).
Equitable estoppel "consists of three elements: `voluntary conduct or representation, reliance, and detriment.'" Hill, 402 Md. at 310, 936 A.2d 343 (quoting Mona Elec. Co. v. Shelton, 377 Md. 320, 334, 833 A.2d 527 (2003)). As the Court has explained, "[t]o assert equitable estoppel, the asserting party `must have been misled to his [or her] injury and have changed his [or her] position for the worse, having believed and relied on the representations of the party sought to be estopped.'" Dickerson v. Longoria, 414 Md. 419, 453-54, 995 A.2d 721 (2010) (quoting Creveling v. GEICO, 376 Md. 72, 102, 828 A.2d 229 (2003); some alterations in original).
In Pavel Enterprises, however, the Court cautioned against confusing promissory estoppel with equitable estoppel. See 342 Md. at 146 n. 1, 674 A.2d 521. Although we have not uncovered any reported Maryland case fully articulating in one opinion the distinctions between the two doctrines, the courts of other states have suggested some pertinent differences.
Several courts recognize that, "to work an equitable estoppel . . . the representation in question must be of some present or past fact, while promissory estoppel rests upon a promise to do something in the future." Trollope v. Koerner, 106 Ariz. 10, 470 P.2d 91, 98-99 (1970). See, e.g., Bd. of County Comm'rs v. DeLozier, 917 P.2d 714, 716 (Colo.1996) ("While the doctrine of promissory estoppel is applicable to promises, the doctrine of equitable estoppel is applicable to misstatements of fact."); Del Hayes & Sons, Inc. v. Mitchell, 304 Minn. 275, 230 N.W.2d 588, 595 (1975) ("[E]quitable estoppel is akin to fraud. It does require a representation or concealment of material facts."). See also Panno v. Russo, 82 Cal.App.2d 408, 186 P.2d 452, 455 (1947); Union Carbide Corp. v. City of Danbury, 257 Conn. 865, 778 A.2d 204, 209 n. 2 (2001); Decatur Coop. Ass'n v. Urban, 219 Kan. 171, 547 P.2d 323, 329 (1976); Sullivan v. Porter, 861 A.2d 625, 632 & n. 7 (Me.2004); Sullivan v. Chief Justice, 448 Mass. 15, 858 N.E.2d 699, 711 n. 9 (2006); Old Equity Life Ins. Co. v. Jones, 217 So.2d 648, 652 (Miss. 1969); Feinberg v. Pfeiffer Co., 322 S.W.2d 163, 168 (Mo.Ct.App.1959); In re Estate of Helling, 510 N.W.2d 595, 596 n. 1 (N.D. 1994); Hortman v. City of Miamisburg, 110 Ohio St.3d 194, 852 N.E.2d 716, 720 (2006); Clifton v. Ogle, 526 S.W.2d 596, 603 (Tex.Civ.App.1975); Youngblood v. Auto-Owners Ins. Co., 158 P.3d 1088, 1092 (Utah 2007); Woolaver v. State, 175 Vt. 397, 833 A.2d 849, 856 n. 4 (2003); Klinke v. Famous Recipe Fried Chicken, Inc., 94 Wash.2d 255, 616 P.2d 644, 646-47 (1980).
A second distinction recognized in some cases is that promissory estoppel "is offensive, and can be used for affirmative enforcement of a promise," while equitable estoppel is ordinarily "defensive, and can be used only for preventing the opposing party from raising a particular claim or defense." Mortvedt v. State, 858 P.2d 1140, 1143 n. 7 (Alaska 1993). See Youngblood, 158 P.3d at 1093 ("`[P]romissory estoppel is a sword, and equitable estoppel *1226 is a shield.'") (citations omitted). See also, e.g., Newton Tractor Sales, Inc. v. Kubota Tractor Corp., 233 Ill.2d 46, 329 Ill.Dec. 322, 906 N.E.2d 520, 526 (2009); Chrysler Credit Corp. v. Bert Cote's L/A Auto Sales, Inc., 707 A.2d 1311, 1318-19 (Me.1998); Hoye v. Westfield Ins. Co., 194 Mich.App. 696, 487 N.W.2d 838, 842 (1992); White v. White, 293 S.W.3d 1, 16-17 & nn. 9 & 10 (Mo.2009); Kelly v. Rio Grande Computerland Group, 128 S.W.3d 759, 769 (Tex. App.2004); Klinke, 616 P.2d at 646-47; Baures v. N. Shore Fire Dept., 264 Wis.2d 815, 664 N.W.2d 113, 123 n. 7 (App.), cert. denied, 266 Wis.2d 63, 671 N.W.2d 849 (2003).
Other courts have remarked that, although "equitable estoppel is not actually a cause of action, [it is] . . . `an equitable doctrine that suggests a tort-related theory.'" Robinson v. Colo. State Lottery Div., 179 P.3d 998, 1004 & n. 5 (Colo.2008) (citations omitted). In contrast, "`a claim of promissory estoppel lies in contract.'" Id.
It is clear that, despite these distinctions, promissory estoppel and equitable estoppel are related. As can be seen from comparing the Court of Appeals's descriptions of the two doctrines, they share in common that the person invoking either doctrine must have relied, to his or her detriment, on the representations (whether as to past, present, or future matters) of the other party.
As the Court recounted in Pavel Enterprises, the doctrine of promissory estoppel emerged from certain idiosyncratic classes of cases, such as construction bidding disputes, see Pavel Enters., 342 Md. at 152-61, 674 A.2d 521, and charitable subscription cases, see id. at 164-65, 674 A.2d 521 (discussing Md. Nat'l Bank v. United Jewish Appeal Fed'n, 286 Md. 274, 407 A.2d 1130 (1979), a charitable subscription case). The unifying thread running through these cases was that one party had made a promise or commitment to the other, but one of the traditional elements of a bilateral contractoffer, acceptance, or considerationwas missing.
For example, the charitable subscription cases involved an individual pledging a contribution to a charity. In United Jewish Appeal, 286 Md. at 275-76, 407 A.2d 1130, a philanthropist pledged $200,000 to the charity, but died with $133,500 still unpaid on his pledge. The charity sought to recover the unpaid pledge from the philanthropist's estate, but the personal representatives disallowed the claim. Id. The pledge was not a contract in the traditional sense, because there was no consideration for the gratuitous, charitable donation. Id. at 289, 407 A.2d 1130. The Court determined, however, that Maryland law supported a promissory estoppel theory of recovery, provided that "`the promisee had actually incurred obligations relying upon the promises,'" when "`one has made a subscription and thereby authorized the entering into engagements to accomplish the purpose for which the subscription was made, the subscription was upon a valuable consideration.'" Id. at 283-84, 407 A.2d 1130 (citation omitted).[50] In other words, the detrimental reliance of the promisee could substitute for more traditional consideration.
Similarly, in Pavel Enterprises, a construction bid case, a general contractor requested bids from mechanical subcontractors for use in completing a full bid for a renovation project at the National Institutes of Health. 342 Md. at 146-47, 674 A.2d 521. A subcontractor submitted a bid for the mechanical work, which the general contractor used in submitting its *1227 winning bid to the agency. Id. at 147, 674 A.2d 521. Upon winning the contract, the general contractor sent the subcontractor a purported acceptance of its bid, but the subcontractor responded that its bid "contained an error, and as a result the price was too low." Id. at 150, 674 A.2d 521. Because the subcontractor had not realized that the general contractor had been awarded the contract (there had been another, lower, bidder on the contract who had subsequently been disqualified), it had not felt "compelled to correct the error" earlier. Id. The general contractor completed the work with another subcontractor at a higher cost, and sued the original subcontractor for the difference. Id. at 151, 674 A.2d 521.
In that context, the Pavel Enterprises Court elucidated its formulation of the elements of promissory estoppel, which we have set forth, supra, reasoning that, because the subcontractor's bid "was an offer to contract and . . . it was sufficiently clear and definite," the Court was required to determine if the general contractor "made a timely and valid acceptance of that offer and thus created a traditional bilateral contract, or in the absence of a valid acceptance, if [the general contractor's] detrimental reliance served to bind" the subcontractor to its bid. Id. at 161-62, 674 A.2d 521 (emphasis added).[51]
Thus, in Maryland, promissory estoppel is an alternative means of obtaining contractual relief. As the Pavel Enterprises Court explained: "[T]here are different ways to prove that a contractual relationship exists. . . . Traditional bilateral contract theory is one. Detrimental reliance can be another." Id. at 169, 674 A.2d 521. As the federal court has put it:
Maryland recognizes that promissory estoppel may serve as a substitute for consideration in enforcing a promise that the law would not otherwise enforce, thus making a one-sided promise into an enforceable contract by dint of the necessary reliance having been placed on it by the promisee. Thus, . . . the nature of a lawsuit in which promissory estoppel is invoked remains that of an action to enforce a contract.
Suburban Hospital, Inc. v. Sampson, 807 F.Supp. 31, 33 (D.Md.1992) (citations omitted).
In this case, the MdTA's principal bulwark against the appellants' promissory estoppel claim is the statement in ARA Health Services that, "[o]rdinarily, the doctrine of estoppel does not apply against the State. . . ." 344 Md. at 96, 685 A.2d 435. But, as we have noted, the claim at issue in ARA Health Services was characterized as one for equitable estoppel. In that case, the State Department of Public Safety and Correctional Services entered into a written contract with ARA to provide healthcare services to HIV-positive inmates. Id. at 88, 685 A.2d 435. Under the terms of the contract, ARA "was not entitled to compensation on a dollar-for-dollar basis for AIDS medication administered to inmates at correctional facilities. However, [ARA] would receive reimbursement . . . for the actual cost of AIDS medication furnished to inmates at hospitals. . . ." Id. at 89, 685 A.2d 435 (emphasis in original). Nevertheless, ARA submitted, and the Department paid, invoices for the "actual cost of AIDS medication provided to inmates at correctional facilities," in the amount of $135,446. Id. After an audit revealed the *1228 discrepancy, the Department sought to recover the overpayment. Id. at 90-91, 685 A.2d 435. ARA maintained that the written contract had been modified by the parties' conduct, id. at 93, 685 A.2d 435, and that the "understanding between the parties was that [ARA] would be reimbursed for all AIDS medication costs. . . ." Id. at 91, 685 A.2d 435.
The company contended "that the Department should . . . be estopped, on equitable grounds, from denying the validity of the contract modification." Id. at 96, 685 A.2d 435. The Court rejected that argument, stating: "Ordinarily, the doctrine of estoppel does not apply against the State, and this would seem to be particularly the case where, as here, an estoppel is sought with respect to State correctional services." Id.
For that proposition, the Court cited several cases, all of which concerned equitable estoppel. See Salisbury Beauty Schools v. State Bd. of Cosmetologists, 268 Md. 32, 63-64, 300 A.2d 367 (1973) (rejecting beauty school's argument that regulatory agency's prior rules and policy equitably estopped enforcement of statute that barred beauty schools from charging clients for treatment performed by students, because "the doctrine of estoppel will not be applied against the State in the performance of its governmental, public or sovereign capacity or in the enforcement of police measures"); Agnew v. State, 51 Md.App. 614, 657, 446 A.2d 425 (1982) (rejecting former Governor's contention that "State's refusal to take earlier action against Mr. Agnew []or its acceptance . . . of payment of back taxes" equitably estopped State's claim for damages due to Governor's bribery and kickback scheme); Cuppett & Weeks Nursing Home, Inc. v. Dept. of Health & Mental Hygiene, 49 Md.App. 199, 209, 430 A.2d 875 (1981) (rejecting claim that State agency's "delay in enforcing . . . regulations warrants application of the equitable estoppel doctrine to preclude such enforcement"); see also Fed. Armored Express, Inc. v. Pub. Serv. Comm'n, 273 Md. 231, 244, 328 A.2d 264 (1974) (predating ARA Health Services; rejecting armored car companies' contention that State regulator should be equitably estopped from denying them operating licenses "so that their established business will continue"); Marriott v. Cole, 115 Md. App. 493, 508, 694 A.2d 123 (decided after ARA Health Services; rejecting attempt to equitably estop State university from denying professor tenure), cert. denied, 347 Md. 254, 700 A.2d 1215 (1997).
The wide variety of scenarios presented in the above cases, in which claims to equitably estop the State have been uniformly rejected, disposes of the Lodge's attempt to distinguish ARA Health Services on the ground that the instant case does not arise in ARA's correctional services context.
We recognize the caveat in ARA Health Services and other cases that, "ordinarily," equitable estoppel cannot be asserted against the State. See, e.g., ARA Health Servs., 344 Md. at 96, 685 A.2d 435; Heartwood 88, Inc. v. Montgomery County, 156 Md.App. 333, 370, 846 A.2d 1096 (2004); Anne Arundel County v. Muir, 149 Md.App. 617, 635, 817 A.2d 938 (2003); Gregg Neck Yacht Club, Inc. v. County Comm'rs of Kent County, 137 Md.App. 732, 774, 769 A.2d 982 (2001); Marriott, 115 Md.App. at 508, 694 A.2d 123. Accordingly, it may be that an extraordinary case presenting particularly compelling equitable grounds would give rise to equitable estoppel against the State. However, we are unaware of any Maryland case so holding, and the Lodge has cited none, nor has it alleged any extraordinary circumstances in this case. Neither has the Lodge contended that the MdTA was not *1229 acting in "its governmental, public or sovereign capacity," and we see no circumstances here that place this case beyond the ambit of the cases where equitable estoppel of the State has been rejected.
We also recognize that the Lodge's complaint alleged promissory estoppel. The line of cases on which the MdTA relies in asserting that it cannot be estopped are all equitable estoppel cases, and we have not found a Maryland case that considered whether promissory estoppel applies to the State. Nevertheless, we are persuaded that the rule articulated in the equitable estoppel cases is applicable here.
First, it appears to us that Count II of the Lodge's complaint, although styled as a "promissory estoppel" claim, may actually sound in equitable estoppel. As we have seen, promissory estoppel is a device for contractual recovery, when an element of a traditional bilateral contract is lacking. The Agreement, on its face, plainly displays offer, acceptance, and mutual consideration. Therefore, there is no need to substitute the Lodge's alleged detrimental reliance for a contractual element that is absent. Rather, it seems to us that the Lodge's use of a detrimental reliance theory is more akin to the equitable estoppel argument rejected in ARA Health Services: the Lodge seeks to use its alleged detrimental reliance to estop the MdTA "from denying the validity of the contract." ARA Health Servs., 344 Md. at 96, 685 A.2d 435. Cf. County Comm'rs of Caroline County v. J. Roland Dashiell & Sons, Inc., 358 Md. 83, 92-101, 747 A.2d 600 (2000) (holding that, "generally, quasi-contract claims such as quantum meruit and unjust enrichment cannot be asserted where an express contract . . . exists"). Considered as an assertion of equitable estoppel against a State agency, the Lodge's claim fails, on the strength of the authorities already cited.
But, even if we consider the Lodge's complaint as a promissory estoppel claim, we conclude that promissory estoppel is also subject to the rule that, ordinarily, it may not be asserted against the State in the exercise of its governmental, public, or sovereign capacity. Our conclusion proceeds from our determination that the rationale underlying the rule in the equitable estoppel context applies with equal force in the context of promissory estoppel.
As the equitable estoppel cases cited above exemplify, the "archetypal" governmental equitable estoppel case involves a claimant seeking to prevent the State from applying an otherwise valid law or regulation because of the prior statements or conduct of public employees, upon which the claimant detrimentally relied, which led the claimant to assume that the applicable law was otherwise. See GREGORY C. SISK, LITIGATION WITH THE FEDERAL GOVERNMENT 754 (2000) (discussing "archetypal governmental equitable estoppel case"). If the claimant were permitted equitably to estop the State in such a case, the result would be an outcome that directly contravened the applicable substantive law, merely because at some point a public official misspoke. As one court put it, "`[e]stoppel' is just a way to describe a decision of a subordinate official that prevails over a decision of the political branches expressed in a law or regulation." United States v. Medico Indus., Inc., 784 F.2d 840, 845 (7th Cir.1986).
Considering the doctrine of promissory estoppel in a similar vein, we note that the State is bound by its contracts only by virtue of its waiver of sovereign immunity. It is a bedrock principle of sovereign immunity that, "[i]f the State chooses, by legislative action, to waive its sovereign immunity, [the courts] strictly construe[] the waiver in favor of the State." Proctor v. Wash. Metro. Area *1230 Transit Auth., supra, 412 Md. 691, 709, 990 A.2d 1048 (2010) (citing Bd. of Educ. v. Zimmer-Rubert, 409 Md. 200, 212, 973 A.2d 233 (2009)); see also ARA Health Servs., 344 Md. at 92, 685 A.2d 435. As we have seen, the legislature's waiver of sovereign immunity in contract actions, contained in S.G. § 12-201(a), waives sovereign immunity only where there is a "written contract that an official or employee executed for the State or 1 of its units while the official or employee was acting within the scope of the authority of the official or employee." Because we must construe this waiver narrowly in favor of the State, we consider that it contemplates a traditional bilateral contract, not a contract that arises through the vehicle of promissory estoppel. We find equally applicable here what this Court said in MTA v. Granite Constr. Co., 57 Md.App. 766, 780-81, 471 A.2d 1121 (1984), when it considered the related concept of recovery against the State on a theory of unjust enrichment:
[R]ecovery for unjust enrichment is based upon an implied in law contract. The two concepts [of sovereign immunity and unjust enrichment] are incompatible. However meritorious a claim based upon an implied contract may be, if that claim is against the State or any of its agencies, it is barred because it is not based upon a written contract. In this case, it would also be barred because it is allegedly based upon a contract implied as a result of conduct on the part of an employee who was acting outside the scope of his employment.
Accordingly, we shall affirm the circuit court's grant of summary judgment as to Count II of appellants' complaint. As noted, we previously rejected the MdTA's asserted bases for contending that the Agreement was unenforceable as a contract, which necessitates a remand for further proceedings. In those proceedings, the Lodge cannot circumvent the State's narrow waiver of sovereign immunity by seeking to recover based on promissory estoppel. If the Lodge is to prevail in this action, it must do so as matter of contract law, not on a theory of estoppel.

F. Cross-Appeal
As noted, the MdTA has noted a conditional cross-appeal, asking that, if we remand to the circuit court, we determine the merits of its motion to disqualify appellants' counsel and exclude certain evidence, on the basis of alleged ethical improprieties involved in appellants' counsel's hiring of former MdTAP Chief McLhinney as a consultant. We decline the Authority's invitation.
The circuit court denied the motion to disqualify as "moot," without deciding the merits, because of its grant of summary judgment to the Authority. We recognize that we are authorized to review issues "raised in or decided by the trial court." Md. Rule 8-131(a) (italics added). In other words, we have discretion to consider a matter that was raised in, but not decided by, the trial court. See, e.g., Carrier v. Crestar Bank, N.A., 316 Md. 700, 725, 561 A.2d 227 (1989); Montgomery County Bd. of Educ. v. Horace Mann Ins. Co., 154 Md.App. 502, 518-19, 840 A.2d 220 (2003), aff'd, 383 Md. 527, 860 A.2d 909 (2004); Mattingly v. Hughes Elecs. Corp., 147 Md.App. 624, 645, 810 A.2d 498 (2002), aff'd sub nom. DIRECTV, Inc. v. Mattingly, 376 Md. 302, 829 A.2d 626 (2003). Nevertheless, it is usually "not desirable to address an issue without the benefit of its having been examined and first resolved by the lower court." Carrier, 316 Md. at 725, 561 A.2d 227; see also Mattingly, 147 Md.App. at 645, 810 A.2d 498. This is particularly true of matters that involve contested questions of fact, as appellees' disqualification motion may, because it is *1231 not our role to make findings of fact. See, e.g., Gruss v. Gruss, 123 Md.App. 311, 321, 718 A.2d 622 (1998) ("We, as an appellate court, will not make factual determinations properly left to the trial court.").
Accordingly, we shall vacate the circuit court's denial of the motion to disqualify, because, in light of our reversal as to summary judgment, it is no longer "moot."
GRANT OF SUMMARY JUDGMENT REVERSED AS TO COUNT I OF PLAINTIFFS' COMPLAINT AND AFFIRMED AS TO COUNT II OF PLAINTIFFS' COMPLAINT. DENIAL OF MOTION TO DISQUALIFY PLAINTIFFS' COUNSEL AND EXCLUDE EVIDENCE VACATED. CASE REMANDED FOR FURTHER PROCEEDINGS. COSTS TO BE PAID 50% BY APPELLANTS, 50% BY APPELLEES.
NOTES
[1] The MdTA experienced a change in leadership, occasioned by the 2006 gubernatorial election.
[2] The individual police officers were Antwan Boykin, Yancy Anthony, Kevin Hoak, Daniel Smith, Carl Pelton, Tom Shepke, Joseph Dugan, James Schuler, Stephen Kolackovsky, Ernest Wright, and Edgar Caraballo. We shall refer to all appellants, collectively, as the "Lodge" or "FOP."
[3] As the MdTA points out in its brief, the "Maryland Transportation Authority Board" is not a legal entity separate from the MdTA. Rather, the Maryland Transportation Authority "consists of" the Secretary of the Department of Transportation sitting ex officio as Chairman of the Authority, and eight individual members of the Authority appointed by the Governor. Md.Code (2008 Repl.Vol., 2009 Supp.), § 4-202(a)-(b) of the Transportation Article.
[4] When the plaintiffs' complaint was filed, Ronald L. Freeland was the Executive Secretary of the MdTA. John D. Porcari, by virtue of his office as Transportation Secretary, was its Chairman.
[5] The then-current MdTA member defendants were Susan M. Affleck Bauer, Louise P. Hoblitzell, Carolyn Peoples, Carol D. Rieg, Walter E. Woodford, the Rev. Dr. William C. Calhoun, Sr., Isaac H. Marks, and Michael J. Whitson; the sole former MdTA member named as a defendant was John B. Norris, Jr. All of the individually-named defendants were sued in their official capacities. We shall refer collectively to the institutional and individual defendants/appellees as the "MdTA" or the "Authority."
[6] As posed by appellants, the questions are as follows:

1. Is a State Agency, which is Granted Uniquely Independent Budgetary Authority by the State, within its Authority when Entering into Procurement Contracts pursuant to that Authority?
2. Is an Agreement which Incorporates an Exhaustive Set of Terms and Conditions Sufficiently Clear and Definite to be Upheld in a Court of Law?
3. Is an Agreement Consistent with Public Policy where it does not Contemplate any Improper Influence over the Legislature, is not Contingent on the Defeat of Legislation, is Properly Ratified pursuant to State Procurement Law and does not Violate any Statutory Preconditions?
4. Is a Claim for Promissory Estoppel Legitimate when the Promise, Reasonably relied upon to the Detriment of the Promisee, is Reneged by the Promisor?
[7] See MdTA v. King, 369 Md. 274, 799 A.2d 1246 (2002) (affirming MdTA's termination of an employee); Okwa v. Harper, 360 Md. 161, 757 A.2d 118 (2000) (in police excessive-use-of-force case, reversing grant of summary judgment in favor of MdTA police officers); McLean Contracting Co. v. MdTA, 70 Md.App. 514, 521 A.2d 1251 (affirming dismissal of breach of contract suit by construction contractor against MdTA), cert. denied, 310 Md. 130, 527 A.2d 51 (1987); Bugg v. MdTA, 31 Md.App. 622, 358 A.2d 562 (affirming dismissal of landowner's suit challenging condemnation of land for construction of toll highway, on grounds of MdTA's sovereign immunity from suit), cert. denied, 278 Md. 717 (1976), cert. denied, 429 U.S. 1082, 97 S.Ct. 1088, 51 L.Ed.2d 529 (1977).
[8] The parties have not discussed the agency's functions or operations in any detail.
[9] The MdTA should not be confused with the Maryland Transit Administration ("MTA"), a unit of the Department of Transportation. See Md.Code (2008 Repl.Vol., 2009 Supp.), §§ 2-107(a)(3) & 7-201 of the Transportation Article. The MTA is tasked with developing and managing the public bus and rail mass transit services of the State. See id. §§ 7-102 & 7-204. The MdTA is also distinct from the Maryland Transportation Commission ("MTC"), a unit of the Department of Transportation created to "study the entire transportation system of [the] State," and to "advise and make recommendations ... on all matters that concern transportation policy formation and program execution." Id. § 2-205. See also id. §§ 2-107(a)(9) & 2-202 (MTC is a unit of the Department).
[10] In this opinion, we generally shall cite to the versions of the relevant articles of the Maryland Code that are currently in force, and which are (with minor exceptions) substantively identical to the versions that were in force in February 2006, when the Agreement was signed. To the extent that intervening substantive changes in the statutory provisions are relevant to our discussion, we shall note them at the appropriate juncture.
[11] Before the Authority was created, these functions were within the bailiwick of the State Roads Commission. See Bugg, 31 Md. App. at 622-33, 358 A.2d 562. The State Roads Commission, a unit of the Department of Transportation, Transp. § 2-107(a)(7), is situated within the State Highway Administration. Transp. § 8-210. The responsibilities of the State Roads Commission now pertain exclusively to its constitutional function of acquiring private land for the creation of highways and related uses. See Md. Const., art. III, § 40B; Transp. §§ 8-218; 8-302; 8-318 to 8-339.
[12] The General Assembly altered the composition of the Authority by statute in 2006, after the Agreement in this case was signed, but before appellants filed suit. See 2006 Md. Laws, Spec. Sess. ch. 1. Before the statutory change, the Authority consisted of six members, rather than eight (in addition to the Chairman), who served staggered terms of three years, rather than four. Id. § 1. The new statute took effect January 1, 2007. Id. § 3.
[13] The Attorney General discussed the then-current trust agreement in an unpublished opinion in 1985, explaining that the trust agreement required MdTA's revenues to be deposited with the Authority's trustee to the credit of an "Operating Fund." See Md. Att'y Gen., Opinion No. 85-005, 1985 Md. AG LEXIS 36, at *9 (Feb. 13, 1985). In 70 Op. Att'y Gen. 229 (1985), the Attorney General published a synopsis of the unpublished opinion. According to the initial opinion, the Authority's current expenses are paid out of the Operating Fund, and the excess is transferred to a number of other accounts to pay the bond service and meet other obligations of the Authority. 1985 Md. AG LEXIS 36, at *9. The Attorney General noted that the trust agreement pledges all of the Authority's revenues as security for the Authority's bonds, and the agreement "specifically provides that [Transp.] § 4-313 does not apply"; therefore, "the revenues of the Maryland Transportation Authority are not set aside in the Transportation Authority Fund." 1985 Md. AG LEXIS 36, at *9.
[14] In the unpublished 1985 opinion referenced in note 13, supra, the Attorney General relied on Wyatt to determine that the MdTA's revenues "are not `moneys of the State' subject to the appropriation process, unless and until they are transferred ... to the Transportation Trust Fund." 1985 Md. AG LEXIS 36, at * 13. The Attorney General also opined that "full legislative control over the Transportation Authority's budget would impair the contract embodied in the Trust Agreement," and thus violate the Contract Clause of Article I, § 10 of the United States Constitution. Id. at * 14.
[15] In 2008, after the events giving rise to this case, the General Assembly passed legislation mandating that, at the time of submission of the annual "budget bill to the ... General Assembly," the Authority shall provide a detailed six-year "financial forecast for the operations of the Authority." Transp. § 4-210 (codifying 2008 Md. Laws, ch. 567; eff. July 1, 2008).
[16] In 1989, after the issuance of the Attorney General's opinion, legislation was introduced to alter the independent salary-setting authority of various executive agencies so as to establish a consistent and uniform "executive pay plan" for the Executive Branch. See H.B. 1475, 1989 Gen. Assembly. As originally drafted, the bill would have eliminated the MdTA's independent authority to "fix the compensation" of its employees. However, as ultimately enacted, the bill retained the MdTA's broad authority to fix compensation, and simply revised Transp. § 4-205 to require that compensation for executive management positions within the MdTA be "consistent with the compensation of comparable positions" in the DOT, and that "the compensation established by the Authority shall be reported to the General Assembly each year as part of the Authority's presentation of its budget." 1989 Md. Laws, ch. 831. That language appears in the Code. See Transp. § 4-205(d)(1).
[17] Notably, the Transportation Article contains additional authorization for the staffing of the Authority. Section 4-203(a) states that the Authority "is entitled to the staff provided in the State budget." Moreover, the Secretary of the DOT "shall provide the Authority with the personnel of the Department that the Secretary considers necessary for the performance of the maintenance and other functions required of the Authority to meet its obligations with respect to its transportation facilities projects." Transp. § 4-203(b). The provisions now codified in Transp. § 4-203 were part of the original enactment establishing the Authority. See Md. Ann.Code, Vol. 4A (1957, 1971 Repl.Vol.), Art. 41, § 208C(a) (codifying 1970 Md. Laws, ch. 526). That enactment also provided, however, that "[a]ll power, authority, covenants, obligations, duties and discretion undertaken and assumed by the State Roads Commission ... under trust agreements pursuant to the authority of enabling legislation authorizing the issuance of revenue bonds for ... transportation facilities projects ... are hereby transferred, granted to and vested exclusively in the Maryland Transportation Authority...." Id. § 208C(c).

In 1977, when the Code Revision Commission compiled the Transportation Article from the various transportation-related provisions found in the Annotated Code of 1957, the language of Transp. § 4-203 was drawn from the MdTA's enabling statute in the Annotated Code. See Md.Code (1977), § 4-203 of the Transportation Article, and the Revisor's Note. But, in furtherance of the statutory command that the MdTA was to exercise all power regarding toll infrastructure previously delegated to the Commission, the Code Revision Commission also created the authorization for staffing found at Transp. § 4-205(d), which was drafted as "new language ... patterned after the substantially similar provisions" that had governed the Commission's earlier superintendence of the State's toll facilities. Revisor's Note to Md.Code (1977), § 4-205 of the Transportation Article (citing, inter alia, Md. Ann.Code, Vol. 8A (1957, 1969 Repl.Vol., 1975 Cum.Supp.), Art. 89B, §§ 123(g) & 144(j) (grants of authority to hire employees and fix compensation, substantively equivalent to Transp. § 4-205(d))). The Revisor did not explicitly acknowledge that two different authorizations for staffing of the MdTA had been included in the Transportation Article, or discuss the relationship between the provisions. The Attorney General's 1988 opinion regarding the independent staffing authority of the MdTA relied solely on Transp. § 4-205, without addressing Transp. § 4-203. See 73 Op. Att'y Gen. 285, 287-88 (1988).
[18] During the litigation, the Lodge filed an "Amended Complaint" and a "Second Amended Complaint," which corrected spellings of names and minor factual misstatements that are not material to the appeal. We shall refer to the complaints collectively as the "complaint," unless otherwise noted.
[19] Senator John Giannetti introduced S.B. 722 in the State Senate. The bill provided for collective bargaining for MdTAP's officers. Delegate Steven DeBoy introduced a companion bill, H.B. 1151, in the House of Delegates.
[20] Delegate DeBoy's bill was withdrawn on March 6, 2006. Senator Giannetti's bill was withdrawn a week later.
[21] One appointee succeeded John Norris, who left in 2007, and the Governor filled two new vacancies created by the General Assembly's 2006 enactment. See note 12, supra.
[22] As we discuss, infra, during the pendency of this appeal, in the 2010 legislative session, the General Assembly enacted legislation granting collective bargaining rights to MdTAP officers. See 2010 Md. Laws, ch. 704.
[23] After the Lodge filed its Second Amended Complaint, the MdTA filed a "Motion to Dismiss Second Amended Complaint for Failure to State a Claim." Noting that the Second Amended Complaint did not vary the material allegations of the original complaint, the MdTA simply attached to the motion a copy of the memorandum of law that accompanied its original motion to dismiss.
[24] Given that the Agreement committed the MdTA to fund the PPV program in fiscal years 2007, 2008, and 2009, which have now passed, and that the General Assembly has now passed collective bargaining legislation for MdTAP officers, we have considered the question of mootness, although the parties have not addressed the issue. See, e.g., Prince George's County v. FOP, Prince George's County, Lodge 89, 172 Md.App. 295, 303, 914 A.2d 199 (2007). "A case is moot when there is no longer an existing controversy when the case comes before the Court or when there is no longer an effective remedy the Court could grant." Suter v. Stuckey, 402 Md. 211, 219, 935 A.2d 731 (2007). See State v. Ficker, 266 Md. 500, 506-07, 295 A.2d 231 (1972) ("Appellate courts do not sit to give opinions on abstract propositions or moot questions, and appeals which present nothing else for decision are dismissed as a matter of course.").

We recognize that the advent of a new budget year can render moot certain types of budgetary challenges. See, e.g., Bishop v. Governor, 281 Md. 521, 525, 380 A.2d 220 (1977) (holding, in declaratory challenge to the validity of fiscal year 1977 budget bill, that "the 1977 fiscal year budget has now expired and as to it no actual controversy can exist"). But, this case presents a contract claim, not a declaratory challenge to a particular budget bill. Moreover, whether this case is moot involves facts and legal determinations as to the availability of relief that are not apparent from the record. See Legacy Funding LLC v. Cohn, 396 Md. 511, 514-15 n. 2, 914 A.2d 760 (2007) (declining to dismiss case that "might well be moot," where "the records are not clear on this point [and the parties] have not raised the issue of mootness") (emphasis omitted). Therefore, we shall "assume that the case [is] not moot" for purposes of our analysis. Id.
[25] Maryland Rule 2-501(f) provides: "The court shall enter judgment in favor of or against the moving party if the [summary judgment] motion and response show that there is no genuine dispute of material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Therefore, "`[i]n granting or denying a motion for summary judgment, a judge makes no findings of fact.'" Hill v. Cross Country Settlements, LLC, 402 Md. 281, 294, 936 A.2d 343 (2007) (citation omitted). Rather, "a trial court decides issues of law, not fact, when granting summary judgment." A.J. Decoster Co. v. Westinghouse Elec. Corp., 333 Md. 245, 261, 634 A.2d 1330 (1994).

In its Motion to Dismiss, the MdTA accepted "the factual allegations of the FOP's amended complaint as true for purposes of seeking to have that complaint dismissed, including the FOP's allegation that MdTA ratified the `agreement.'" See 120 W. Fayette St., LLLP v. Mayor of Baltimore, 407 Md. 253, 261, 964 A.2d 662 (2009). However, the Authority asserted that, if the case "survive[d] the present motion to dismiss," it would contest the Lodge's factual allegations at trial and would "prove," inter alia, that the Authority "did not ratify any `contract' between Kittleman and the FOP." That issue is not before us.
[26] "[T]he General Assembly has the power to establish the terms under which it will permit a waiver of immunity...." Rios v. Montgomery County, 157 Md.App. 462, 852 A.2d 1005 (2004), aff'd, 386 Md. 104, 872 A.2d 1 (2005).
[27] A one-year statute of limitations applies to contract claims against the State under this waiver. See S.G. § 12-202.
[28] Appellees point out that the State's waiver of sovereign immunity as to contract actions is limited to claims "based on a written contract." S.G. § 12-201(a). But, the MdTA does not contend that the waiver of sovereign immunity under S.G. § 12-201 is inapplicable to the agency. Nor did the lower court decide whether the waiver of sovereign immunity under S.G. § 12-201 applies to the MdTA. Therefore, we do not decide that question. Rather, we focus "`only [on] the grounds upon which the trial court relied in granting summary judgment.'" Catalyst Health Solutions, Inc. v. Magill, 414 Md. 457, 471, 995 A.2d 960 (2010) (citation omitted).
[29] Williston points out: "A lack of definiteness in an agreement may concern the time of performance, the price to be paid, work to be done, property to be transferred, or miscellaneous stipulations in the agreement." 1 WILLISTON, § 4:21, at 644.
[30] As noted, the Agreement also states: "Provided the bills are withdrawn, and no collective bargaining legislation covering the MdTAP is passed this session, the Authority will add funds to the FY '07 budget for the first phase of the proposed PPV program, in [an] amount reasonably close to the $3.82 million outlined in the current proposal." Further, it specifies that, "[i]n each of the next two fiscal years, the Authority will continue to fund the three-year phase-in of the PPV, provided that no collective bargaining legislation covering the MdTAP is passed."
[31] To the extent that the MdTA claimed that the binder was not the "notebook," a dispute of material fact would arise, which would be fatal to summary judgment on this issue.
[32] In arguing that the Agreement incorporates the "notebook," appellants rely upon both a signed and an unsigned writing. Ordinarily, in order to incorporate an unsigned writing, a signed document must "make[] clear reference to the [unsigned] document and describe[] it in such terms that its identity may be ascertained beyond doubt." 11 WILLISTON § 30:25, at 233 The RESTATEMENT § 132, comment c, provides further guidance:

Where the signature of the party to be charged is made or adopted with reference to an unsigned writing, the signed and unsigned writings together may constitute a memorandum. It is sufficient that the signed writing refers to the unsigned writing explicitly or by implication, or that the party to be charged physically attaches one document to the other or encloses them in the same envelope. Even if there is no internal reference or physical connection, the documents may be read together if in the circumstances they clearly relate to the same transaction and the party to be charged has acquiesced in the contents of the unsigned writing.
[33] Although the authors of the binder did not "show their work" by providing the full details of how the annual cost was calculated from the numbers of vehicles and per-vehicle pricing, it is self-evident how the figure was derived:

237 marked vehicles × $29,770.36 per marked vehicle = $7,055,575.32 65 unmarked vehicles × $28,971.76 per unmarked vehicle = $1,883,164.40 $7,055,575.32 (marked) + $1,883,164.40 (unmarked) = $8,938,739.72 (total) $8,938,739.72 (total capital expenditure) over 3 years = $2,979,579.91 per year
We view as immaterial the 84-cent discrepancy in the bottom line figure. It is easily explained as the result of rounding at some point in the calculation, and in any event is insignificant in the context of a multi-million dollar sum.
[34] In 1848, the federal government had not yet waived its sovereign immunity in contract, and so if an individual sought to be compensated by the United States, the only avenue for redress was a private bill enacted by Congress. See Richard H. Seamon, Separation of Powers and the Separate Treatment of Contract Claims Against the Federal Government for Specific Performance, 43 Vill. L.Rev. 155, 175-76 (1998).
[35] The statute does not define a "contractor," but State procurement regulations provide that "`[c]ontractor' means any person having a contract with a procurement agency." COMAR 21.01.02.01B(27) (Supp. No. 26). A "procurement agency" is defined as "any principal department or independent unit of the Executive Branch of the State, not otherwise exempted from application of this title, that is authorized by law or regulations to procure." Id., 21.01.02.01B(66).
[36] The maxim is fully articulated by the Latin phrase, "expressio unius est exclusio alterius" literally, the expression of one thing is the exclusion of another. See, e.g., Hudson v. Housing Auth. of Balt. City, 402 Md. 18, 30, 935 A.2d 395 (2007). As with all canons of statutory construction, "expressio unius" is not a rule of law, but is a tool to assist courts in discerning the intent of the Legislature. See Walzer v. Osborne, 395 Md. 563, 578-79, 911 A.2d 427 (2006).
[37] In its brief, the MdTA alludes to the jurisdictional issue only in passing. But, we are not at liberty to disregard a jurisdictional question. See Laurel Racing Ass'n v. Video Lottery Facility Location Comm'n, 409 Md. 445, 457, 975 A.2d 894 (2009) ("[T]he State's abandonment of its exclusive or primary jurisdiction and exhaustion of administrative remedies argument has no effect upon this Court's obligation to consider the issue.").
[38] This principle is in harmony with the rule that "`an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts.'" Md. Aviation Admin. v. Noland, 386 Md. 556, 572, 873 A.2d 1145 (2005) (citation omitted). "`Even with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency.'" Id. By applying the administrative exhaustion rule, the courts ensure that they will have the benefit of the reasoning and experience of the agency that most often is called upon to administer and interpret the statutes in question, and which "possesses specialized knowledge or expertise regarding the underlying subject matter of the statute." Heery, 384 Md. at 145, 862 A.2d 976.
[39] Heery provided a "hypothetical example of an agency lacking palpable jurisdiction[:] . . . `a probate court, invested only with authority over wills and the estates of deceased persons, attempting to try someone for a criminal offense.'" Id. at 144-45, 862 A.2d 976 (quoting State Comm'n on Human Relations v. Freedom Express/Domegold, Inc., 375 Md. 2, 19-20, 825 A.2d 354 (2003)).

After Heery, this Court determined, in Fraction v. Sec'y, Dept. of Corr., 179 Md.App. 721, 947 A.2d 614, cert. denied, 405 Md. 349 (2008), that an agency was "palpably without jurisdiction." Fraction turned on whether the Department of Corrections had the power to adjust an inmate's "diminution of sentence credits" after the inmate was released early but violated his parole. Id. at 724, 947 A.2d 614. We determined that the Department of Corrections was "palpably without jurisdiction" over the diminution credits, because the statutory scheme vested complete authority over the credits in another agency, the Maryland Parole Commission. Id. at 731-33, 947 A.2d 614.
[40] Notably, the Court of Appeals for the Federal Circuit is the court that exercises appellate jurisdiction over the United States Court of Federal Claims, which has exclusive jurisdiction over most procurement contract disputes with the federal government.
[41] Under the MdTA's logic, every agreement entered into by the State could be characterized as a "procurement contract" for "services," subject to the jurisdiction of the Board of Contract Appeals. For instance, one could describe a plea bargain as a contract whereby the State "procures" the defendant's "service" of pleading guilty, with the "compensation" of a more favorable sentence.
[42] As noted, during the pendency of this appeal, the General Assembly enacted legislation authorizing collective bargaining between MdTA and MdTAP officers. See 2010 Md. Laws, ch. 704.
[43] The Court distinguished Anderson because, in that case, "the arbitrator's decision purported to bind the County Executive and the County Council in enacting the annual budget for the ensuing fiscal year." Id. at 168, 665 A.2d 1029.
[44] In Ehrlich v. Maryland State Employees Union, 382 Md. 597, 856 A.2d 669 (2004), the Court decided another significant case concerning public employee collective bargaining, although its holdings do not directly pertain to the issues in this case. Subsequent to the events of McCulloch, "[i]n an effort to provide a more solid base for a collective bargaining regime and not have it rest solely on an Executive Order that could be modified or revoked by subsequent Governors," the General Assembly enacted a statutory program for State employee collective bargaining that "incorporated some features and provisions of the Executive Order but was far more extensive." Id. at 601, 856 A.2d 669. That program is presently codified, as amended, in Title 3 of the S.P.P. Article. Much like the executive order in McCulloch, the statutory scheme calls for the execution of a memorandum of understanding between an employee union and "`the Governor or the Governor's designee.'" Id. at 602, 856 A.2d 669 (quoting statute). Under the statute, "`a memorandum of understanding is not effective until it is ratified by the Governor.'" Id. (quoting statute; emphasis in Ehrlich).

The facts of Ehrlich were that, one day before the end of Governor Glendening's term of office, his chief of staff, "upon direction by the Governor, `approved' two memoranda of understanding (MOU) with [a State employees' union] that carried a fiscal impact to the State of approximately $100 million." Id. at 599, 856 A.2d 669. The incoming administration refused to ratify or fund the obligations of the memoranda, id. at 604, 856 A.2d 669, and the litigation concerned whether the memoranda were "effective and enforceable," despite not having been approved personally by Governor Glendening. Id. at 599, 856 A.2d 669. The Court held that they were not enforceable, determining that the statute "does not permit ratification by a designee of the Governor, but only by the Governor him/herself." Id. at 607, 856 A.2d 669 (emphasis in original). It opined that the Governor's "act of personally signing" a memorandum might "suffice as a ratification," id. at 608, 856 A.2d 669, but that, in the absence of a personal signature by the Governor, the Governor must ratify it by "some public act or statement of an equivalent nature." Id. at 609, 856 A.2d 669.
[45] As noted, in the posture of this case, i.e., for purposes of the appeal, appellees do not dispute that Kittleman had the authority to bind the MdTA or that the Authority ratified the Agreement. Therefore, we need not decide whether Kittleman's signature, without the Authority's concurrence, would have been sufficient to bind the agency.
[46] Notably, S.G. § 12-203 provides that, "[t]o carry out" the waiver of sovereign immunity in contract actions provided by S.G. § 12-201, discussed earlier, the "Governor shall include in the budget bill money that is adequate to satisfy a final judgment that, after the exhaustion of the rights of appeal, is rendered against the State or any of its officers or units." None of the collective bargaining cases we have reviewed has considered S.G. § 12-203. Nevertheless, if S.G. § 12-203 applies here, it would appear to affect the Governor's discretion over the budget. In our view, however, this does not compel the conclusion that the Agreement is invalid under the collective bargaining precedents (although it may have other implications for how, if at all, appellants can obtain the relief they seek). We explain.

First, it is not clear that S.G. § 12-203 would apply to the MdTA, a non-budgeted agency. See Bd. of Educ. of Worcester County v. BEKA Indus., Inc., 190 Md.App. 668, 709-712, 989 A.2d 1181 (holding that, although S.G. § 12-201 waives the sovereign immunity of county boards of education as to contract claims, "S.G. § 12-203 does not provide a mechanism for appropriation of State funds to satisfy a judgment against a county board of education," because "the boards are subject to the county, not State, budget process," and therefore "it does not appear that the State would be responsible for paying a judgment against a county board of education"), cert. granted, 415 Md. 38, 997 A.2d 789 (2010). Second, even if S.G. § 12-203 applies, the General Assembly has ultimate authority (with exceptions not applicable here) to "strike out or reduce" items in the State budget. See Md. Const., art. III, § 52(6). Although S.G. § 12-203 requires the Governor to include proposed appropriations in the budget bill to satisfy final judgments against the State, the statute does not require the General Assembly to pass the proposed appropriations. Cf. H. Dean Bouland, Abrogation of Sovereign Immunity in Contract Cases in Maryland, 6 U. BALT. L.REV. 337, 344 & n. 60 (1977) (noting that if the Legislature "refuse[s] to appropriate sufficient funds in any given year, there is currently no procedure whereby judgments may be resubmitted in subsequent years," and in that case, "[t]he successful plaintiff would be left without a remedy").
Because the parties have not mentioned S.G. § 12-203 in their briefs, and the circuit court did not discuss it, we will not rule on its applicability. In any event, the Lodge must identify some "`provision for the payment of judgments'" in order to obtain relief. Brooks v. Hous. Auth. of Balt. City, 411 Md. 603, 615, 984 A.2d 836 (2009) (citation omitted). See also Stern v. Bd. of Regents, 380 Md. 691, 701, 846 A.2d 996 (2004); Univ. of Md. v. Maas, 173 Md. 554, 559, 197 A. 123 (1938); BEKA Indus., 190 Md.App. at 692 & 709-10, 989 A.2d 1181. Cf. Prince George's County v. Aluisi, 354 Md. 422, 450-51, 731 A.2d 888 (1999) (concluding that mandamus did not lie to compel the Chief Judge of the District Court to appoint constables where money had not already been appropriated for the purpose).
[47] In this regard, we find apt the comments of the federal court in Nat'l Treasury Employees Union v. Chertoff, 452 F.3d 839 (D.C.Cir. 2006), involving a dispute between a federal agency and a federal employees' union as to whether a collective bargaining agreement was binding. There, the court quoted with approval the district court judge's observations that the "`sine qua non of good-faith collective bargaining is an enforceable contract once the parties reach an agreement,'" id. at 851 (quoting Nat'l Treasury Employees Union v. Chertoff, 385 F.Supp.2d 1, 25 (D.D.C.2005)), and that "`[a] contract that is not mutually binding is not a contract. . . . A system of "collective bargaining" that permits the unilateral repudiation of agreements by one party is not collective bargaining at all.'" Id. (quoting 385 F.Supp.2d at 28).
[48] In rejecting the contentions raised by the MdTA, we express no view as to any other defenses that the Authority may raise on remand, including any additional public policy objections to the enforcement of the Agreement.

Moreover, we express no opinion as to the enforceability of the Agreement under the collective bargaining statute that was recently enacted. We observe that the 2010 enactment is not substantively identical to the proposed legislation that was the subject of the Agreement. Of particular note, the 2010 legislation authorizes "all full-time Maryland Transportation Authority police officers at the rank of first sergeant and below" to participate in the existing program of State employee collective bargaining under Title 3 of the S.P.P. Article. See id. The withdrawn 2006 legislation would have created a new stand-alone program of collective bargaining for the officers. See, e.g., S.B. 722, 2006 Gen. Assembly (first reader), available at http://mlis.state. md.us/2006rs/bills/sb/sb0722f.pdf (last visited Sept. 13, 2010).
[49] Writing for the Court in Pavel Enterprises, Judge Karwacki disfavored the term "promissory estoppel," preferring instead the designation, "detrimental reliance." In Judge Karwacki's view, the latter phrase "more clearly expresses the concept intended" and "alleviate[s] the confusion [of] promissory estoppel with its distant cousin, equitable estoppel." 342 Md. at 146 n. 1, 674 A.2d 521.
[50] On the facts before it, however, the Court denied recovery because the charity had not, in fact, made a "change [in] position . . . in reliance on the subscription which resulted in an economic loss. . . ." Id. at 289, 407 A.2d 1130.
[51] Pavel Enterprises made clear that, under appropriate circumstances, promissory estoppel can also substitute for acceptance, rather than consideration. But, the Court ultimately upheld as not clearly erroneous the trial court's determination that the general contractor had not proved the reasonable reliance element of promissory estoppel. Id. at 168, 674 A.2d 521.